Argued October 29, reversed and remanded December 19, 1962

MOORE ET UX *v*. RICHFIELD OIL CORPORATION
377 P. 2d 32

*John R. Faust, Jr.,* Portland, argued the cause for appellant. On the briefs were Cake, Jaureguy, Hardy, Buttler & McEwen, Portland.

*William M. Holmes,* Bend, argued the cause for respondents. On the brief were DeArmond, Goodrich, Gray & Fancher, Bend.

Before McALLISTER, Chief Justice, and PERRY, SLOAN, O'CONNELL, GOODWIN, LUSK and DENECKE, Justices.

O'CONNELL, J.

This is a suit in equity which plaintiffs, lessors, seek to terminate a lease made with defendant, lessee, and to obtain possession of the leasehold. Plaintiffs assert the right to terminate the lease on the ground that defendant was in default in the payment of the rent beyond the grace period specified in the lease and that the lease was terminated in accordance with its terms. The lease was obtained for the operation of a gasoline filling station. Defendant appeals from

a decree terminating the lease and ordering defendant to deliver possession of the premises to plaintiffs.

The premises were leased to defendant for a period of 20 years commencing on February 2, 1957. The lease provided for the payment of a rental of 1½¢ for each gallon of gasoline delivered to the leased premises with a guaranteed minimum of $150 per month. Subsequently, defendant subleased the premises to Ira Merritt, who, in turn, assigned his interest to Clovas Garren.

The percentage rental was computed and paid by defendant under the following arrangement. The station operator would communicate his order for gasoline to Robert Comstock, defendant's local distributor at Redmond, Oregon. The gasoline would be delivered from defendant's storage facilities at Linnton, Oregon, near Portland. Upon making delivery the driver would make out an invoice ticket (referred to as a "102 ticket") indicating the amount of gasoline delivered. The invoice would then be forwarded through Comstock to defendant's offices in Seattle where the percentage rental under the lease and under the sublease would be computed.

Defendant explains the default in payment of the rent relied upon by plaintiffs as follows. The station operator and Comstock arranged for the delivery of gasoline to the station from Comstock's supply at Redmond instead of from the supply at Linnton. The station operator paid for such gasoline with checks made payable to Comstock. Comstock reported these sales as having been made to another station at Culver, Oregon. (He was the owner of the latter station.) These deliveries were not invoiced on the "102 ticket" and were not reported to defendant's Seattle office as a part of the deliveries to the station in question.

Plaintiffs learned of this practice and sought advice from their attorney, Mr. W. M. Holmes. Mr. Holmes directed the following letter to defendant's Seattle office on July 25, 1960:

"Richfield Oil Corporation
2326 Sixth Avenue
Seattle 1, Washington

> Re: Mr. and Mrs. Vern B. Moore
> P. O. Box 633, Madras, Oregon
> Our File No. 6951

Gentlemen:

This office represents Mr. and Mrs. Vern B. Moore of Madras, Oregon, who entered into a lease agreement with the Richfield Oil Corporation on October 28, 1955, and covering certain premises on The Dalles-California Highway a short distance south of Madras, Oregon.

Article III of their lease states that they will receive $1\frac{1}{2}¢$ per gallon for each gallon of gasoline delivered to the leased premises, with a minimum rental payment of $150.00 per month.

It has been recently brought to the attention of Mr. and Mrs. Moore that they have not been receiving either credit or payment for all gasoline delivered to the leased premises. It also appears that apparently this has been true for a considerable period of time.

We, therefore, on behalf of Mr. and Mrs. Moore, request that you advise us of what steps you are going to take to correct this matter.

> Very truly yours,
>
> De ARMOND, GOODRICH & GRAY
> By: [Signed] W. M. Holmes

WMH/mh"

This letter was received at defendant's offices in Seattle on July 27. Defendant introduced testimony that the letter was sent to the credit department in

Seattle and then forwarded to the credit department in Portland. It went from there to the sales department and was eventually received by Mr. Berger, the defendant's district wholesale supervisor on August 17, 1960. Mr. Berger immediately called Mr. Wood, the company's representative in Redmond, who got in touch with plaintiffs' attorney on or about August 25, 1960. Thereafter, Mr. Wood commenced an investigation which disclosed the checks made out to Mr. Comstock for the gasoline delivered to the station and which had not been reported on the "102 tickets." Several conferences between defendant's agents and plaintiffs' attorney were then held. Finally, in the latter part of September, defendant made an offer of settlement, first to plaintiffs and then to plaintiffs' attorney, of an amount represented by the checks known to them at that time which were made payable to Comstock. Neither plaintiffs nor defendant knew the exact amount of gasoline not properly reported. Defendant admitted on cross-examination that there were records in its possession from which it would have been possible to determine the total gallonage pumped from the station.

The sole question is whether equity should terminate the lease under the foregoing circumstances.

■ First we shall dispose of plaintiffs' contention that the lease was terminated by operation of law under ORS 91.090.[1] This statute is operative only in those

---

[1] "91.090 The failure of a tenant to pay the rent reserved by the terms of his lease for the period of 10 days, unless a different period is stipulated in the lease, after it becomes due and payable, operates to terminate his tenancy. No notice to quit or pay the rent is required to render the holding of such tenant thereafter wrongful; however, if the landlord, after such default in payment of rent, accepts payment thereof, the lease is reinstated for the full period fixed by its terms, subject to termination by subsequent defaults in payment of rent."

44

cases where the lease itself does not make provision for the manner in which the tenancy is to be terminated.[2] In the case at bar the lease contained such a provision. Article 15 of the lease provided as follows:

"In the event Lessee shall be in default in the payment of rentals or other charges hereunder or shall otherwise breach its covenants or obligations hereunder, and shall be and remain in default for a period of thirty (30) days after notice from Lessor to it of such default, Lessor shall have the right and privilege of terminating this lease and declaring the same at an end and of entering upon and taking possession of said premises, and shall have the remedies now or hereafter provided by law for recovery of rent, repossession of the premises and damages occasioned by such default.
* * *"

It is undisputed that defendant defaulted in the payment of rent and that plaintiffs were entitled to proceed in accordance with the provisions of Article 15 of the lease to terminate the tenancy. The question is whether plaintiffs have complied with these contractual provisions.

The letter of July 25, 1960 which is set out above cannot be regarded as a notice of default within the meaning of Article 15 of the lease. While the letter notifies the lessee that lessor has "not been receiving either credit or payment for all gasoline delivered to the leased premises," this does not constitute a "notice of default." A notice of default must convey the message that the notifier is initiating the steps necessary to finally assert his legal rights and that if the default is not cured he may take final action as pro-

[2] Cases such as Rainey v. Quigley, 180 Or 554, 178 P2d 148, 170 ALR 1149 (1947) and Baker v. Lehrer, 210 Or 635, 312 P2d 1072 (1957) are not in point. The leases in those cases did not contain provisions for the termination of tenancy.

vided in the contract.[8] In other words, in the present case the provision for notice of default in Article 15 must be read in relation to the provision for termination. The notice to the lessee must give him warning that the lessor will assert his right of termination if the lessee does not cure the default within the 30-day period of grace. The letter of July 25 does not give this warning.

Plaintiffs did, however, give effective notice on September 22, 1960. That letter, written by plaintiffs' attorney, contained the following paragraph:

> "We are, therefore, advising you pursuant to Article 15 of the lease that Mr. and Mrs. Moore hereby elect to terminate the lease. For this reason, we will expect that Richfield Oil or its lessee will have moved from the leased premises not later than October 31, 1960. This also includes the removal of all that personal property described in Article 25 of the lease."

Although the notice is couched in terms of "termination," it clearly fulfills the purpose of a notice of default.

Defendant had 30 days after the date of mailing the letter on September 22 to cure the default.[9] Mr. Berger testified that he called on Vern Moore, the plaintiff, on or about September 25, 1960 and informed him that the checks made payable to Mr. Comstock had been located and "that Mr. Merritt and Mr. Garren were prepared to swear that this was all there was." At that time Mr. Berger made an offer of settlement

---

[8] Cf., Clarizo v. Spada Distributing Co., 74 Or Adv Sh 1153, 373 P2d 689 (1962) and cases collected in 2 Merrill on Notice § 774, p. 216, n. 68 (1952).

[9] Article 20 of the lease provides in part that "the date upon which such notice is mailed shall be treated as the date of service."

in the amount of $228.76. Mr. Moore responded by referring Mr. Berger to plaintiffs' attorney. Mr. Berger met with plaintiffs' attorney and made the same offer of settlement. It was refused. On December 7, 1960 plaintiffs instituted the present suit.

The record leaves no doubt that defendant's agents made a conscientious effort to obtain the data necessary to compute the unpaid rent and it also clearly appears that the offer of settlement was made in good faith. Defendant's letter of October 4, 1960, in response to plaintiffs' "notice of termination" on September 22 expressed defendant's willingness to make payment of any deficiency. The letter stated, "If you have knowledge of any other delivery on which we have not paid rental we will be pleased to receive full particulars thereon." In the negotiations prior to that time defendant's agents exhibited the same willingness to arrive at a fair settlement. The delay in making an investigation after receiving the letter of July 25 is explained by defendant as resulting from the complications in transmitting the letter to the proper department in its organization. That is not an implausible explanation considering the magnitude of defendant's business and the complexity of its operations. But even assuming that the delay was not attributable to that cause, we do not think that the defendant's conduct was such as to indicate bad faith on its part in making settlement of the deficiency in rent. While the breach occurred over a long period of time (from March 1957 to June 1960) defendant did not know that its employee and the station operator had engaged in the deceptive scheme until it received notice through the letter of July 25. The conduct of its agents beginning with Mr. Berger's receipt of the July 25th letter on August 17, 1960 indicates that a

reasonable effort was made to compute the shortage. This evidence of good faith reflects back upon and gives further plausibility to defendant's explanation for its delay in processing the letter of July 25.

We have already observed that defendant's records would have disclosed the gallonage pumped from the leased station and that a computation of the deficiency in rental could have been made from that record. Equity would listen to defendant's plea with an unsympathetic ear if the agents had purposely failed to disclose these records in an effort to obtain a more favorable settlement. But as we interpret the evidence, defendant's failure to produce these records was not a calculated scheme to avoid meeting its obligations to plaintiffs. Defendant's agents may have been negligent in the treatment of plaintiffs' claim, but the fault was not of such a character as to warrant the forfeiture of the lease. Until defendant received the letter of September 22, 1960 containing the notice of default it had no reason to feel that there was need for haste in investigating the cause of the deficiency. After receiving the notice of default defendant proceeded with diligence.

■ When the failure to pay rent in accordance with the terms of the lease is due to excusable neglect equity will ordinarily refuse to decree a forfeiture of the lease.[9]

■ We hold that defendant's neglect was excusable and that it is entitled to equitable relief against forfeiture. The cause is reversed and remanded with

[9] Thomas v. Given, 75 Ariz 68, 251 P2d 887 (1952); Wylie v. Kirby, 115 Md 282, 80 A 962 (1911); Gould v. Hyatt, 154 NE 173 (Ohio Ct App 1926). See, Caine v. Powell, 185 Or 322, 202 P2d 931 (1949).

directions to take such evidence as is necessary to compute the deficiency in the rental payments and to enter judgment for the amount found to be due, together with interest thereon.

Reversed and remanded.