Argued May 5, modified and remanded with directions
November 30, 1972

STATE HIGHWAY COMMISSION, *Plaintiff, v.*
DEMAREST ᴇᴛ ᴜx, *Respondents-Cross-appellants
as to Fowler, Appellants as to Bill Hay, Inc.*
BILL HAY, INC., *Respondent as to Demarest et ux,*
FOWLER, *Appellant-Cross-respondent as to
Demarest et ux.*

DEMAREST ᴇᴛ ᴜx, *Appellants, v.* FOWLER,
*Respondent.*
503 P2d 682

*Richard E. Miller,* Eugene, argued the cause for appellant Fowler.

*Stanley R. Darling,* Eugene, argued the cause for respondents Demarest.

*Keith Rodman,* Eugene, argued the cause and filed the brief for respondent Bill Hay, Inc.

HOWELL, J.

This is a proceeding supplemental to a condemnation action to determine the proper allocation of the award made by the State of Oregon in the condemnation case. The award was paid into court, and the parties disagree as to their respective rights in the award and as to the amounts awarded by the trial court. Also involved in this appeal is a forcible entry

and detainer action between two of the parties to this litigation. Because of the number of parties involved they will be referred to by their proper names.

In November 1964 Demarest leased to Fowler a restaurant and adjacent parking area in Eugene. In December 1964, one month after the lease agreement, Demarest contracted to sell the premises to Donald Malone and also assigned the Fowler lease to Malone. The defendant Bill Hay, Inc., a realty firm, handled the sale for Demarest. The commission, which amounted to $10,000, was paid by $5,000 in cash from Demarest and by a $5,000 note from Malone to Demarest, endorsed without recourse by Demarest to Bill Hay, Inc. Malone assigned his interest in the Demarest purchase contract to Hay as security for the note.

Approximately three years later, in January 1968, Malone and Demarest entered into an agreement cancelling the contract of sale and reassigning the Fowler lease to Demarest.

In February 1968 Demarest instituted f.e.d. proceedings against Fowler for failure to pay the February rental.

In October 1968 the Oregon State Highway Commission filed a complaint in eminent domain for a taking of that portion of the Demarest property which included the Fowler restaurant. The condemnation action was settled by stipulation for $160,000, which was paid into court and which is the subject of the dispute in this case. Fifty thousand dollars of the award was paid to the First National Bank to apply on a mortgage from Demarest to the bank.

The trial court awarded $9,991 to Fowler; $4,046 to Bill Hay, Inc.; $19,809 additional to First National Bank; and the balance to Demarest. Fowler appeals,

contending he is entitled to a larger award. Demarest appeals from the award made to Bill Hay, Inc., and cross-appeals from the award made to Fowler. Demarest also appeals from the judgment of the court dismissing the f.e.d. action as being moot.

## RIGHTS OF FOWLER TO A PORTION OF AWARD

Demarest contends that Fowler's failure to pay his rent on the due date terminated his status as a tenant and therefore Fowler is precluded from receiving any portion of the condemnation award.

The lease executed in November, 1964, required the monthly rental of $250 to be paid on the first day of each month, and also required the first and last month's rental be paid in advance. In accordance therewith Fowler paid Demarest $500.

After Demarest contracted to sell the property to Malone in December, 1964, and assigned the Fowler lease to Malone, Fowler made his payments to Malone through the Citizens Valley Bank in Albany. On January 8, 1968, Malone and Demarest agreed to a cancellation of the sales contract, and the Fowler lease was reassigned to Demarest. Fowler did not pay the rent due on January 1, 1968, until January 22, 1968. On February 13, 1968, the rent due on February 1 had not been paid, and Demarest filed a forcible entry and detainer action against Fowler. On the same day Fowler tendered $250 rent to the Citizens Valley Bank, but the check was returned by the bank to Fowler on the 29th of February. Demarest dismissed the f.e.d. action in the district court and re-filed in the circuit court. Before the issues in the f.e.d. action were tried in the circuit court, the State Highway Commission

filed its condemnation action. The parties stipulated that the issues in the f.e.d. action would be determined in these proceedings to allocate the condemnation award. The circuit court dismissed the f.e.d. proceedings as moot because it was then impossible to restore possession of the premises to either party because of the taking by the Highway Commission.

Demarest contends that the relationship of landlord and tenant with Fowler was terminated when Fowler failed to pay the February 1968 rental on the due date or within the grace period of ten days allowed by the terms of the lease.

Fowler offers several answers to Demarest's contention. First, he suggests that under the terms of the lease he was entitled to "written demand and reasonable notice" before Demarest was entitled to declare him in default for failure to pay the rental when due. We do not construe the lease as Fowler contends. The lease provides:

> "If the Lessee shall be in default in the payment of any rents and such default shall continue for a period of ten days, or if the Lessee shall fail to perform or comply with any other terms, covenants or conditions of this lease on written demand and reasonable notice, then the Lessors may at their election declare this lease terminated * * *."

It is clear from reading the quoted portion above that for breaches other than non-payment, the lessor is required to make a written demand and give reasonable notice; insofar as non-payment of rent is concerned, the lessee is allowed ten days' grace period and no notice or demand is required.

■ Fowler also contends, and alleged as a separate defense to the f.e.d. action, that he was not in default

in the payment of the February 1968 rent when the f.e.d. action was filed on February 13, 1968. The basis of this defense is not clear from the briefs. We assume, however, that Fowler is relying upon the check for $250 sent by him to the Citizens Valley Bank after the f.e.d. action was filed. In Fowler's brief he states that "the lease was reinstated by Demarest's collection agent receiving and retaining the rental check until February 29, 1968." The bank had been the escrow agent for the sale transaction between Demarest and Malone. However, the record does not show that the bank was acting as the agent for Demarest, or that it was the intention of Demarest or the bank that the check be accepted as payment. Fowler did not mail the check until after he had been served with the summons and complaint in the f.e.d. action on February 13, 1968. It is true that the bank did not return the check until February 29; however, the check was never delivered to Demarest or deposited to his account, but instead was returned to Fowler by the bank. The record does not establish that Demarest or the bank expressly or impliedly accepted the February check as late payment under the statute, ORS 91.090, which we will discuss subsequently.

██ Fowler also contends that he was not in default for non-payment of the February 1968 rent because he had paid the first and last month's rent in advance in 1964 when the lease was executed. This argument is also without merit. Prepaid rent becomes the absolute property of the landlord. *Sinclair v. Burke,* 133 Or 115, 287 P 686 (1930). See also Annot., 27 ALR2d 656. Obviously, when the landlord requires the first and last month's rental to be paid in advance, he also expects that the monthly rental in the interim will be paid according to the terms of the lease. Fowler

concedes the rule that the last month's advance rental cannot be applied to any rental except the last month, but argues that "in equity" it should be applied to the February rental. Fowler cites no cases supporting this theory and we see no reason why this rule should be different in equity.

Demarest contends that the Fowler lease was terminated under the provisions of ORS 91.090 as a result of Fowler's failure to pay rent for a period of ten days. That statute states, in pertinent part:

> "The failure of a tenant to pay the rent reserved by the terms of his lease for the period of 10 days, unless a different period is stipulated in the lease, after it becomes due and payable, operates to terminate his tenancy. No notice to quit or pay the rent is required to render the holding of such tenant thereafter wrongful; however, if the landlord, after such default in payment of rent, accepts payment thereof, the lease is reinstated for the full period fixed by its terms, subject to termination by subsequent defaults in payment of rent."

The Fowler lease provides for the same 10-day grace period as provided in the statute.

The provisions of ORS 91.090 have been considered in several prior decisions of this court. In *Rainey v. Quigley,* 180 Or 554, 178 P2d 148, 170 ALR 1149 (1947), the plaintiff-lessee filed a suit in equity to enjoin an f.e.d. proceeding brought against him by his landlord for failure to pay the rental on the date required in the lease, which was the first day of each month. The lessee had been consistently late in paying the rent each month over a period of 16 months. When the f.e.d. proceeding was filed, the lessee tendered the rent for that month, but the tender was refused. No prior notice of intention to declare a default

was given to the lessee. The lessee alleged that he was "lulled into a sense of security" by the payment and acceptance of the late rentals. The lessee also contended that as forfeitures are not favored in equity, notice must be given before a forfeiture can be declared when the rental payments are consistently late. This court, in an opinion by Mr. Justice Lusk, held that when the lessee failed to pay the rent within the 10 days allowed by the statute, his tenancy was terminated. The opinion states:

> "A provision for forfeiture in a lease for failure to pay rent is generally considered in courts of equity as designed to secure payment, and the court will ordinarily relieve against a forfeiture for such cause upon payment of the sum secured, with interest. [Citing authorities.] So that, if this case involved nothing more than the contract of the parties, there would be no doubt of the jurisdiction and power of the court to grant the relief which the plaintiff seeks. But, unless we are to ignore or rewrite the statute, that power cannot be exercised here, for, under the statute, the failure of the tenant to pay the rent reserved within the time prescribed 'shall operate to terminate his tenancy, and no notice to quit or pay said rent shall be required to render the holding of such tenant thereafter wrongful.' Nor can the acceptance of delinquent payments in previous months alter the case, because 'such acceptance of payment shall operate to reinstate such lease for the full period fixed by its terms, subject to be defeated or terminated by subsequent defaults in payment of rent.' How, then, can it be said that the plaintiff was 'lulled into a sense of security', when the law warned him that he would not be secure in the event of a subsequent default?

> "Or how can the court hold that the defendant should have given notice when the statute says that no notice is required? The acceptance of delinquent

payments in months prior to July, 1946, and the failure to give notice are the only *facts* shown as constituting the foundation of the plaintiff's alleged equity. * * * There was no mistake on the part of the plaintiff, fraud on the part of the defendant, or any act of hers which would create an estoppel. The effect of the acceptance of past due rent was merely to reinstate the lease, not to impair the lessor's statutory rights." 180 Or at 565-66.

In *Caine v. Powell,* 185 Or 322, 202 P2d 931 (1949), the lease required the monthly rental to be paid on the first day of each month. Like the lease in the case at bar, the lease allowed a grace period of 10 days and did not provide for notice to the lessee before a declaration of default. When the lessee failed to pay the January rental on the due date, the lessor initiated an f.e.d. proceeding. The lessee filed a separate suit in equity to enjoin the f.e.d. action and alleged various equitable defenses including certain misrepresentations by the lessor's agent concerning the due date for the rent. This court, again speaking through Mr. Justice Lusk, found that the equitable defense was valid. The opinion was careful to point out, however, that the facts were distinguishable from *Rainey v. Quigley,* supra, where there was no valid equitable defense of mistake, fraud or estoppel. In regard to the contention that the provisions of ORS 91.090 had been waived, the opinion states:

"We do not agree with the contention that the provisions of the statute were waived because the lease now under consideration provides for a forfeiture in the event that the lessees shall allow any installment of rent to become in arrears for a space of ten days after it becomes due. Under the statute the failure of a tenant to pay the rent reserved for a period of ten days after the same becomes

due operates to terminate the lease 'unless a different period be stipulated in the lease'. The period in this lease is not different from, but the same as, that in the statute, and the provisions of the lease giving the landlord the right to re-enter upon a default add nothing to, nor do they differ from, the rights granted him by the statute. It cannot be said that the express incorporation into the lease of what are substantially the provisions of the statute affected in any way the applicability of the statute." 185 Or at 329.

The rules established by this court in *Rainey* and *Caine* were subsequently reiterated in *Loe v. Klein et al.,* 191 Or 654, 233 P2d 209 (1951), and *Baker v. Lehrer et al,* 210 Or 635, 312 P2d 1072 (1957).

In *Loe* no grace period for the payment of the rent was provided for in the lease, and we held that ORS 91.090 providing for the 10-day statutory grace period became, in effect, a part of the lease. As the lessee tendered the payment within the statutory grace period, he was not in default. In *Baker* the lease also failed to provide for a grace period for non-payment of the rent, but the lessee failed to make the payment within the statutory grace period and, in the absence of any equitable defenses such as appeared in *Caine,* the lessee was not entitled to relief.

Fowler relies on a statement made by this court in *Moore et ux v. Richfield Oil Corp.,* 233 Or 39, 43-44, 377 P2d 32 (1967), that ORS 91.090 "is operative only in those cases where the lease itself does not make provision for the manner in which the tenancy is to be terminated." The statement must be interpreted in the light of the facts of the *Moore* case. There, the lease in question provided for a *30-day grace period after notice of default.* Obviously, in such a situation

the provisions of the lease, not the statute, would control the rights of the parties. The statute expressly states that a 10-day grace period is allowed "unless a different period is stipulated in the lease." When the *Moore* lease provided for notice of default and 30 days' grace after such notice, such terms constituted the exception mentioned in the statute.

Unlike the *Caine* case, Fowler did not allege any equitable defense to the f.e.d. action such as mistake, fraud, or estoppel. Fowler's fourth affirmative defense alleged only the conclusion that Demarest "waived any non-payment of rent." No facts are alleged to support the allegation.

In addition to Fowler's total failure to allege any equitable defenses to establish relief against the forfeiture, the evidence does not establish any basis for mistake, fraud, or waiver. The only evidence of waiver was some testimony by Fowler that Demarest asked him, in late January, 1968, how much he wanted for his leasehold interest because of his [Demarest's] negotiations with the State, and Fowler requested $50,000. We cannot see how this conversation could be construed as a waiver of Demarest's rights to have the rental paid according to the terms of the lease or that it misled Fowler into believing that he was not required to pay the rent according to the lease.

■■ We conclude that neither the pleadings nor the evidence raised any grounds for equitable relief. When Fowler failed to pay the February 1968 rental within the 10 days allowed by both the statute and his lease, his tenancy terminated, and Demarest was entitled to recovery under the f.e.d. action. *Rainey v. Quigley,* supra.

Under these circumstances the trial court erred in awarding Fowler the market value of his lease.

## FOWLER'S RIGHT TO RECOVER FOR UTENSILS, IMPROVEMENTS, AND FIXTURES

The trial court, in addition to granting Fowler $7,891 as the bonus value of his lease, also found that Fowler was entitled to the sum of $2,100 as the value of certain fixtures placed in the property by Fowler and taken by the State.

Fowler contends that he is entitled to an award in excess of the $2,100 awarded him by the court for the value of the fixtures, plus an additional award of $7,050 for improvements made to the premises and $24,083 for the value of "removable utensils," which he also describes as "restaurant equipment not taken by the State."

■ We shall first consider Fowler's contentions regarding an award for the removable restaurant utensils. Fowler's argument regarding the cooking utensils is patently erroneous. The utensils are items of personal property. As they were not taken by the State, they were not included in the award of $160,000 paid by the State.

■ Fowler's contention that he is entitled to a portion of the award for certain improvements he made to the restaurant during the term of the lease is equally without merit. As a general rule, in the absence of any agreement to the contrary, on the termination of the lease a lessee is not entitled to payment from the lessor for any improvements made to the premises. *Title & Trust Co. v. Durkheimer Co.*, 155 Or 427, 63 P2d 909, 64 P2d 834 (1937); *Gen. Petroleum Corp. v. Schefter*, 141 Or 349, 16 P2d 645 (1933).

Moreover, the rule is also well established that when leased premises have been taken by eminent

domain, the improvements made by the lessee are material in determining the bonus value of the lease and are not considered separately. 4 Nichols, Eminent Domain 13-48, § 13.121 (1); 1 Orgel, Valuation under Eminent Domain 538, § 126, n 107; Annot., 3 ALR2d 306; 4 U San Fran L Rev 1 (1969).

In the instant case we have already concluded that there was no existing lease at the time of the condemnation; therefore, we are not concerned with bonus value.

Regarding the fixtures, Fowler contends he is entitled to an award of $8,000, the market value of a wall divider, kitchen divider, hood, galvanized sink, dish tables, and a water station which he installed in the restaurant The parties agree that these items were part of the property taken by the State.

The trial court found that these items were fixtures and Fowler was entitled to remove them under the terms of the lease. The trial court deducted "the cost of removal and restoration of the premises to original condition" from the market value of the fixtures and awarded Fowler $2,100 as the value of the fixtures.

Fowler contends he was entitled to an award in excess of $2,100 for the fixtures, and Demarest argues that the lease does not allow Fowler the right to remove fixtures. We agree with Demarest that the lease is silent concerning Fowler's right to remove the fixtures. The lease recites that Fowler, as lessee, "is purchasing the restaurant equipment and furnishings from lessors" and the lease gives Fowler the right to remove the "equipment and furniture" upon expiration of the lease and payment by Fowler. Fixtures are not mentioned. The record shows a bill of sale to Fowler

for various items of restaurant equipment, including chairs, dishes, tables, and other similar personal property. We assume these are the items referred to in the lease, and they do not include the fixtures taken by the State in the condemnation action.

While Fowler is not entitled to remove the fixtures under the provisions of the lease, we conclude that Fowler is entitled to remove them for another reason and is entitled to compensation for their taking by the State.

As a general rule, in the absence of an agreement to the contrary, a tenant may not remove fixtures after the expiration of the term of his lease. *Glaser v. North's et al.,* 201 Or 118, 266 P2d 680 (1954); *Gen. Petroleum Corp. v. Schefter,* supra; *Blake-McFall Co. v. Wilson,* 98 Or 626, 193 P 902 (1921). A different rule, however, exists with respect to trade fixtures. Trade fixtures are items of personal property brought upon the land by a tenant which are necessary to carry on a trade or business. 35 Am Jur 2d 701, Fixtures § 3. Fixtures such as refrigerators, booths, etc., used in the operation of a restaurant are trade fixtures. 36A CJS 691, Fixtures § 38, n 97. *Matz v. Miami Club Restaurant,* 127 SW2d 738 (Mo App 1939). Trade fixtures, contrary to the general rule of fixtures, remain the personal property of the lessee, and, in the absence of an agreement to the contrary, are generally removable by the lessee at the expiration of his lease. *Highway Comm. v. Superbilt Mfg. Co.,* 204 Or 393, 413, 281 P2d 707 (1955); *Glaser v. North's,* supra; 35 Am Jur 2d, supra.

The rule that trade fixtures are removable by the lessee is subject to the qualification that the right of removal must be exercised by the tenant prior to

surrendering possession or to eviction for breach of the lease provisions. *Glaser v. North's,* supra. However, in the instant case the parties stipulated to a continuance of the f.e.d. proceedings and stipulated that the issue of whether Fowler was in default for breach of the lease would be decided in the proceeding to determine the proper allocation of the award. Under these circumstances, Fowler was allowed to remain in possession of the premises and did so until the property was taken by the State in October, 1968. Consequently, Fowler was in no position to remove the trade fixtures. He had not surrendered possession and had not been evicted because the f.e.d. proceedings were still pending when the property was taken. In such a situation it has been held that the tenant would have a reasonable time to remove the trade fixtures after the expiration of the lease, where the lessee, as here, is a party to a pending action disputing the tenant's possession. *Idalia Realty and Development Co. v. Norman et al,* 183 SW 348 (Mo App 1939); 35 Am Jur 2d 734, Fixtures § 43. See also Annot., 6 ALR2d 351, § 18.

We conclude that Fowler is entitled to a portion of the award for the value of his trade fixtures which were taken by the State in the condemnation action.

## VALUE OF THE FIXTURES

■ One of plaintiff's expert witnesses testified that the value of the trade fixtures was $8,000. Apparently he based his valuation on the replacement cost new for the fixtures taken.[1] However, the fixtures taken by

---

[1] He testified:

"$8,000.00. Now the reason why I arrived at this figure, as

the State had been in use for at least four years, and an allowance for depreciation should have been considered.

Demarest's expert witness made a separate valuation of the fixtures and found their value to be $5,600. His valuation was based on the replacement cost new of the fixtures as of October 31, 1968, the date of the taking by the State, less depreciation.

14. The trial court accepted the approach used by Demarest's appraiser and accepted his value of $5,600 for the fixtures. However, the trial court deducted an additional $3,500 as the cost of removal of the fixtures and restoration of the premises, and awarded Fowler $2,100. We believe that the trial court should not have deducted these costs since the State acquired both the restaurant property and the fixtures. The fixtures were not removed nor the premises restored, hence no cost of removal or restoration is involved.

Fowler is entitled to just compensation for the trade fixtures as his share of the award for the taking of the entire property. No evidence of the market price for the fixtures was offered in the instant case.[⊗] Under similar circumstances other courts have used reproduction costs less depreciation to reach just compensation. *United States v. Certain Property, etc.*, 344 F2d 142 (2nd Cir 1965); 388 F2d 596 (2nd Cir 1968);

---

an operator, if you had to go out and purchase that equipment, in other words, using it with our inflation and everything else we have, it would cost you more money."

[⊗] Often market value of trade fixtures, based on comparable sales, is difficult to determine in cases where the trade fixtures are being evaluated separately in condemnation cases. In such circumstances, other approaches, such as reproduction or replacement costs less depreciation, are used. United States v. Certain Property, etc., 388 F2d 596 (2nd Cir 1968).

*Marraro v. State,* 12 NY2d 285, 239 NYS2d 105, 189 NE2d 606 (1963) (cited in Nichols on Eminent Domain 13-30); 29A CJS Eminent Domain 758, § 175 (2); *United States v. Becktold Co.,* 129 F2d 473 (8th Cir 1942).

It is true that Demarest's appraiser, in arriving at his valuation of $5,600, used replacement cost less depreciation, rather than reproduction cost less depreciation.[9] However, we are unable to see any substantial difference in the instant case. The fixtures included wall dividers, hood, sinks, buffet and some seats. We see no necessity of reproducing these exact items when replacement would appear to be equally satisfactory.

We conclude that Fowler is entitled to the sum of $5,600 as just compensation for the fixtures taken and paid for by the State.

## RIGHTS OF BILL HAY, INC., IN THE AWARD

As we have mentioned, when Demarest sold the premises to Malone in December, 1964, the defendant Bill Hay, Inc., was the real estate broker who handled the sale. The commission of $10,000 was paid by $5,000 in cash from Demarest and by a $5,000 note executed by Malone in favor of Demarest and endorsed without recourse by Demarest to Bill Hay. Malone also ex-

---

[9] Reproduction cost is the present cost of reproducing the improvement with one of an exact or highly similar material. Replacement cost is the present cost of replacing the improvement with one having the same utility. American Institute of Real Estate Appraisers, "The Appraisal of Real Estate" (5th ed) 180, ch 12.

The terms have been used interchangeably. In fact, in United States v. Certain Property, etc., supra note 2, the court appears to be referring to replacement costs, not reproduction costs, as it refers to the "current costs of comparable new fixtures" less depreciation.

ecuted an assignment of the purchase contract to Bill Hay as collateral security for the $5,000 note. In January 1968, at the request of Malone, the purchase contract between Malone and Demarest was cancelled. Hay was not a party to the cancellation agreement. At the time of the trial the unpaid balance on the note was $4,046.51. The trial court found that the parties intended that the promissory note and the $5,000 cash were to be full payment to Hay for his commission; that Demarest knew of the assignment from Malone to Hay; and that Hay was entitled to receive $4,046.51 plus interest from the condemnation award.

The assignment by Malone to Hay was for the purpose of securing the Malone note and created an equitable mortgage as between Malone and Hay on the Malones' equitable title in the property being purchased. *Sanders v. Ulrich,* 250 Or 414, 443 P2d 231 (1968); 59 CJS 45, Mortgages § 14. However, as to the vendor Demarest, the assignment by Malone does not give Hay as the assignee a mortgage lien on the property. 59 CJS, supra at 46.

A very similar case to the instant one is *Sanders v. Ulrich,* supra, a suit for strict foreclosure of the vendees' interest in a land sale contract. There, a realtor took an assignment of the purchase contract as security for the down payment which had been loaned to the purchasers by the realtor. The purchasers defaulted and in the suit for strict foreclosure the realtor contended that she had a lien on the land superior to the rights of the vendors. This court decided that as between the purchaser and the assignee, the assignment would be considered a mortgage. As to the vendor, however, the assignee was not a mortgagee, "but stood in the shoes of the purchasers and her rights

could rise no higher than theirs." *Sanders v. Ulrich,* supra at 416. We stated:

"* * * The plaintiff was under no obligation to [the assignee] and the latter could demand nothing of the plaintiff except a deed upon tendering the purchase price of the land, *Merchant Land Co. v. Barbour,* supra [65 Or 235, 130 P 976, 132 P 710 (1913)]. [The assignee's] only claim, however, is that she has a lien on the property and that claim is without any support in law or the facts. If the purchasers are indebted to her, it is to them that she must look for satisfaction." 250 Or at 416.

Hay contends that *Sanders* is not applicable because there the debt was owing from the vendee to the assignee, and in the instant case, according to Hay, the debt was owing from Demarest, the vendor, to Hay, the assignee. We disagree. When Demarest paid Hay the $5,000 in cash and delivered the Malone note for $5,000 endorsed without recourse to Hay, Demarest's obligation to Hay was completely satisfied. Thereafter Hay was required to look to Malone for the payment of the note. Moreover, the evidence indicated that it was explained to the Demarests and to the agent for Hay by the attorney who prepared the document that the obligation on the note was that of Malone and not of Demarest.

It is true that in *Sanders* the vendor did not know about the assignment of the purchase contract by the purchaser-assignor to the assignee, and in the instant case the trial court found that Demarest did know of the assignment. Assuming that finding to be true, we do not believe it changes the result.

Hay's rights under the assignment could not be greater than Malone's. Hay apparently was not in-

terested in assuming the substantial obligations owing by Malone to Demarest under the contract. Without any offer to assume Malone's obligations, Hay, in effect, is asking for a portion of the Demarest award to be paid to him in satisfaction of the Malone debt. If we were to accept Hay's argument, then any purchaser could assign his interest in a contract as security for the purchaser's debt, and the assignee, without assuming the obligation of the contract or making the payment thereunder, could claim all or part of the award to the exclusion of the rights of the vendor.

We conclude that Hay is not entitled to a lien on the award.

The decree of the trial court is modified, and the suit is remanded to the trial court with directions to modify the decree to allow Fowler the sum of $5,600 as his interest in the award and to delete from the decree the award of $4,046.51 in favor of Bill Hay, Inc.