Argued June 4, affirmed August 1, 1974

FRY, *Respondent, v.* D. H. OVERMYER CO., INC., *Appellant.*

525 P2d 140

*J. Terrence Bittner,* Portland, argued the cause for appellant. On the briefs were T. Leonard O'Byrne and McMenamin, Jones, Joseph & Lang, Portland.

*James H. Clarke,* Portland, argued the cause for respondent. With him on the brief were Dezendorf, Spears, Lubersky & Campbell, Portland, and John P. Bledsoe, Laurence F. Janssen and Vawter Parker, Portland.

TONGUE, J.

This is an action for forcible entry and detainer for possession of a warehouse in Washington County for the failure of defendant to pay rent. Defendant was the original owner of the warehouse, but then sold it to plaintiff and leased it back. The court entered judgment for the plaintiff. Defendant appeals. We affirm.

Defendant has assigned 20 errors, and has asked that this court decide the following questions: (1) Was defendant entitled to either abate or continue the action? (2) Was parol evidence admissible to show that this purchase and leaseback was a "hidden loan" transaction? (3) Is California law controlling in this case? (4) Was this transaction a "hidden loan" transaction and did plaintiff's conduct result in a prohibited "forfeiture"? (5) Was the availability of equitable defenses dependent upon a showing that defendant had an ownership interest, rather than that of a tenant? (6) Was a tender of rent made after the filing of this

action a defense? and (7) Was the notice of deficiency "inadequate"?[1]

*The facts.*

This warehouse was built by defendant in 1965. Defendant is an Oregon corporation and is one of 30 state corporations which lease warehouses to Overmyer Distribution Services, which operates nearly 300 warehouses in various parts of the United States. D. H. Overmyer was the "chief executive officer" of these corporations.

In 1968 interest rates were high, money was "tight" and the Overmyer operations were in need of funds. D. H. Overmyer then embarked upon a "sale and leaseback" program. As a part of that "program" defendant entered into a "sale and leaseback" transaction with plaintiff under which defendant deeded this warehouse to plaintiff, subject to a mortgage. Plaintiff then leased it back to defendant. A "Conditional Assignment of Leases and Rental" was also signed at the same time.

At plaintiff's request, the contract of sale included a provision that "this contract shall be construed according to the laws of the State of California." All of the documents were signed simultaneously in Los Angeles. Plaintiff lived in Pasadena. Defendant's executive offices were in New York.

Also at plaintiff's request, a provision was included in the contract to the effect that the transaction was subject to a ruling by the Internal Revenue Service

---

[1] Each of these questions is considered in this opinion, but not in the same order in which defendant would present them for decision.

approving it as a bona fide purchase and lease for federal income tax purposes. The transaction was attractive to plaintiff as an investment because, in addition to "tax benefits," the lease would provide a good "cash flow" and the depreciation was "favorable."

At the time of the transaction there were no conversations between plaintiff and Mr. Overmyer and there was nothing in plaintiff's conversations with the representatives of Mr. Overmyer to suggest that there was any agreement other than as set forth in the various documents.

Plaintiff paid defendant $325,000 for its interest in the warehouse, which was subject to a mortgage balance of $532,000. He carried it on his books at $855,000 and testified that at that price he probably paid as much as $50,000 over the cost of the warehouse. It was appraised for defendant as having a value of $1,304,900.

As a result of the transaction, defendant continued to operate the warehouse as it had before. It also paid the taxes and insurance and maintained the building. There was no change in the relationship with subtenants. Plaintiff, however, undertook to make the mortgage payments and the rental payments from defendants were sufficient in amount to provide funds for that purpose.

In late 1972, plaintiff became concerned that the rental payments were being paid late and the real estate taxes were delinquent. He then called Mr. Overmyer by telephone about the late rental payments. He also called Mr. Overmyer's treasurer about the delinquent taxes, after receiving notice from the holder of the mortgage that they had not been paid. He testified

that he was promised that the taxes would be paid immediately, but that those promises were not kept. One of plaintiff's attorneys then wrote to defendant demanding that two then-delinquent rental payments be paid within 10 days, as well as the delinquent real property taxes, and saying that otherwise plaintiff would exercise "any and all legal remedies available to him under the * * * lease as at law or in equity." Apparently the taxes were then paid, but not the rental payments.

By letter dated January 15, 1973, plaintiff wrote to defendant stating that he was "flabbergasted" by defendant's "apparent lack of honoring commitments"; that defendant had been "consistently late in your rental payments" and had "not paid your property taxes when they were due." That letter then demanded payment by January 20th of the rental payments for November, December and January (due January 20th), as well as accrued interest, accounting and legal fees, and $7,250 as "income tax loss not available for carryback" because of "two months rent loss in 1972." That letter also included a demand "to exercise the trust rights per a guarantee executed by D. H. Overmyer Co., Inc. [of Ohio]." Apparently rental payments for November and December were then made, but not the rent for January.

It appears that a Mr. Hoda, a representative of defendant, then called plaintiff to say that he had been authorized by Mr. Overmyer to negotiate the repurchase of the warehouse. On February 20, 1973, plaintiff again wrote to defendant saying that he "was not prepared to react on that alternative on this date," but that "as of this date I have not received the rental check which was due on 20 January, nor the one which

is due today," and that while he realized that defendant was "having your problems," he wanted to "see you get out of this continuing position of default and resume timely payments to me * * *." Apparently plaintiff received no response to that letter.

On March 5, 1973, a registered letter was mailed to defendant by plaintiff's Oregon attorneys, stating that defendant was "in default by reason of nonpayment of rent due January 20, 1973, and rent due February 20, 1973," and giving "notice of the landlord's intention to terminate the terms of said lease on April 9, 1973," and to then "retake possession of the leased premises."

Nothing was done by or on behalf of defendant, however, until April 5, 1973, when one of defendant's attorneys called plaintiff by telephone. According to that attorney, plaintiff was told that defendant was prepared "to deliver to him all the money that is due" and that defendant wanted "to compose differences and avoid litigation." Plaintiff told the attorney to call his Portland attorney. Defendant's attorney testified that he did so, made the same offer, and was told that plaintiff's Los Angeles attorney would then call him.[2]

Plaintiff's Los Angeles attorney then called back. Defendant's attorney testified that he then offered plaintiff's attorney "the two checks" for the January and February rent payments by telephone on April 5, 1972, but that plaintiff's attorney declined to accept them. By then defendant's attorneys had already prepared "papers" for a suit for a declaratory judgment

[2] Plaintiff's Portland attorney testified that the only offer was to pay the rent due for January and February and that when he inquired of defendant's attorney about the March rental payment he was told only that "nothing is perfect."

and for an injunction, which they filed on that same day. Late on that afternoon they also obtained a temporary restraining order.

On April 9, 1973, the complaint in this action was filed. On the next day, April 10th, a copy of the temporary restraining order was served on one of plaintiff's Los Angeles attorneys. On April 13th defendant deposited $21,991.22 in a bank in plaintiff's name for the then delinquent rental payments for January, February and March, with a further deposit on April 20th for the April rent.

On May 15, 1973, the California court vacated its temporary restraining order and declined to enjoin plaintiff from prosecuting this action.

On July 6, 9 and 10, 1973, the equitable issues arising from defendant's amended answer, alleging affirmative defenses and a plea in abatement, were tried. That trial was followed by a trial of the legal issues arising from the complaint in this action. The court had previously denied defendant's motion for a continuance pending determination of defendant's suit against plaintiff in California. The court had also previously sustained plaintiff's demurrer to defendant's previous plea in abatement asking that this action be abated because of the pending suit in California.

1. *The trial court did not err in denying defendant's motion for a continuance or its plea in abatement.*

Defendant contends that this action was filed "in direct violation of a California restraining order"; that "'comity' dictates that the action should have been stayed"; and that "failure to stay the action was an abuse of discretion which prejudiced the defendant

by requiring it to litigate complex issues on short notice in a summary proceeding."

■ The California temporary restraining order, taken ex parte, enjoined plaintiff from "interfering with the possession and use of the subject property * * * during the pendency of this action." As contended by plaintiff, these provisions were limited to direct interference with possession by self-help in the absence of a prior judicial determination, as described in the California complaint and did not enjoin him from filing of these legal proceedings the next day.[9] Indeed, the California court subsequently declined to hold that in doing so plaintiff was in contempt of that order.

As for the matter of "comity," defendant concedes in its brief that the pendency of a prior action in another state does not entitle a party as a matter of right to an abatement of the second action and that whether to postpone the second action until after a decision in the first action is a matter of discretion. Defendant contends, however, that such discretion is "controlled" by "principles of comity" and that the court abused its discretion in not staying these proceedings as a matter of comity.

In this case, however, the California court not only dissolved its own temporary restraining order, but in doing so the California judge stated, among other things, that:

"* * * It would seem to this Court that the judiciary of Oregon would not find insurmountable difficulties in applying the law of California to the contract involved here, and that the plaintiffs in this case would have a full and complete hearing as

---

[9] See Title & Trust Co. v. Durkheimer Co., 155 Or 427, 448, 63 P2d 909, 64 P2d 834 (1937).

to all of their defenses, both legal and equitable. Under the Oregon law, contrary to our rule, here, this matter could be most quickly disposed of with a hearing under all of the issues in the Oregon forum."

■ Under these circumstances, we find no abuse by the Oregon trial court in refusing to grant either an abatement or a further continuance of this action.④

■ As for the contention that defendant was prejudiced by being required to litigate complex issues on short notice in a summary proceeding, it appears that defendant was not required to go to trial until July 5, 1973, nearly three months after the filing of this action, and that the trial court allowed defendant to fully develop the contentions in support of its equitable defenses in a two-day trial, preceded by lengthy trial memoranda and followed by lengthy oral arguments.

2. *The court did not err in denying defendant's contention that this is a "hidden loan" transaction.*

Defendant first contends that in determining the validity of its contention that this transaction was a "hidden loan" transaction, rather than a sale and lease-back, the law of California should be applied, rather than the law of Oregon, and that the trial court erred in holding to the contrary.⑤ Plaintiff contends, on the

---

④ Authorities cited by defendant, including Simmons v. Superior Court, 96 Cal App 2d 119, 214 P2d 844, 19 ALR2d 288 (1950), are distinguishable on their facts. To the contrary, see Rorvik v. North Pac. Lumber Co., 99 Or 58, 89-90, 190 P 331, 195 P 163 (1921) (overruled on another point in Hansen v. Hayes, 175 Or 358, 154 P2d 202 (1944)); Beneke v. Tucker, 90 Or 230, 235, 196 P 183 (1918); Restatement of Conflict of Laws 2d (1971) § 86; and Annot., 19 ALR2d 303, 305-06, § 2 (1951).

⑤ Defendant relies on a provision in the contract that "this contract shall be construed according to the laws of the State of

other hand, that the law of Oregon is controlling.[6]
Because, however, we reach the same result under both
California law and under Oregon law, we need not
decide which law would otherwise be controlling in
deciding this question.

■■ The courts of both Oregon and California recog-
nize the presumption that a deed which is absolute in
form is what it purports to be unless and until proved
otherwise by clear and convincing evidence. *Blue River
Sawmills et al v. Gates et al,* 225 Or 439, 447-48, 358
P2d 239 (1961), and *Develop-Amatic Engineering v.
Republic Mortgage Co.,* 12 Cal App 3d 143, 148, 91 Cal
Rptr 193 (1970). See also *Beeler v. American Trust
Co.,* 24 Cal 2d 1, 7, 147 P2d 583, 587 (1944). The same
rule is applicable to a sale and leaseback transaction.
See Moewe, Sale and Leaseback Financing of Real
Estate as Mortgages under California Law, 48 Cal
St B J 554, 615 (1973).

■■ In determining whether such a transaction is
what it purports to be, or whether it is a "hidden loan"
in the nature of an equitable mortgage (and as con-
ceded by defendant), the primary question to be deter-
mined is the mutual intent of the parties.[7] There were

California" and contends also that the lease was executed in
California and that rents are payable in California, citing Sterrett
v. Stoddard Lumber Co., 150 Or 491, 503, 46 P2d 1023 (1935), and
Restatement of Conflict of Laws 2d (1971) § 188, among other
authorities.

[6] Plaintiff relies on the fact that there was no "choice of law"
provision in the lease; that the defendant is an Oregon corporation
operating a business in Oregon; that the property is in Oregon,
and that an FED proceeding is "local" in nature, citing Lilienthal
v. Kaufman, 239 Or 1, 395 P2d 543 (1964); Erwin v. Thomas, 264
Or 454, 506 P2d 494 (1973); and Turlock Theatre Co. v. Laws, 12
Cal 2d 573, 86 P2d 345 (1939), among other authorities.

[7] See Blue River Sawmills et al v. Gates et al, 225 Or 439,
446, 358 P2d 239 (1961).

no conversations between the parties or their representatives prior to this transaction indicating that the parties intended it to be of a nature other than as stated by the terms of the documents signed by them. On the contrary, the provision in the contract requiring approval of the transaction by the Internal Revenue Service as a bona fide sale and lease for federal income tax purposes is strong evidence that it was so intended.

Indeed, as stated by Moewe, *supra* at 621:

"The detrimental and often catastrophic effects on a real estate financer of having a sale-leaseback declared to be a mortgage certainly makes careful and knowledgeable preparation of such transactions absolutely essential."

Defendant contends that in determining whether such a transaction is, in fact, a "hidden loan" transaction, "the courts have realized that the economic realities of the transaction are controlling," even in the absence of any express promise to repay the loan or repurchase the property. For that purpose defendant would emphasize the following "factors":

(1) All of the "incidents of ownership" remained in Overmyer.

(2) The "rent" was computed so as to yield plaintiff a ten (10) per cent return on his investment and had no relationship to the fair rental value.

(3) The "sales price" was substantially less than the fair market value of the property.

(4) "Overmyer is unconditionally obligated to pay" the existing mortgage.

Plaintiff responds by pointing out that:

(1) It is completely "legitimate" for a tenant to

assume most of the traditional incidents of ownership under a net lease.[8]

(2) A major purpose of net leases is to give the owners a fixed return on their investments and this is in accord with modern commercial practice.[9]

(3) The sales price was not disproportionate in that plaintiff considered the value of the property to be $855,000 (which was equal to the $325,000 "purchase price" plus the mortgage balance assumed by him of approximately $530,000), as compared with defendant's evidence that the property had a value of $1,304,900 and considering the tax benefits also received by Overmyer.

(4) Regardless of whether defendant guaranteed payment of the mortgage, plaintiff purchased the property subject to the mortgage and made the monthly payments on the mortgage.

In addition to the foregoing "factors," it also appears: (1) that under the terms of this transaction there was no express obligation by defendant to repurchase the property (or to repay what is claimed by defendant to be a "loan"); (2) that the parties to this transaction were not in either a confidential relationship or in a relationship involving unequal bargaining positions; and (3) that no contention is made by defendant on this appeal that the transaction was usurious.

Although none of these additional factors may of themselves be controlling, they have also been recognized as factors to be properly considered in deciding

---

[8] Plaintiff cites R. H. Macy & Co. v. Bates, 280 App Div 292, 114 NYS2d 143, 146 (1952).

[9] Plaintiff cites McPherson, Some Economic & Legal Aspects of the Purchase and Lease of Real Estate by Life Insurance Companies, 97 U Pa L Rev 482, 487 (1947).

whether a sale and lease transaction is in fact a "hidden loan" in the nature of an equitable mortgage.[10]

Defendant has cited numerous cases in support of its contention that this was a "hidden loan" transaction, but only two of such cases involve sale and leaseback transactions.[11] Upon reading these cases, however, we believe that neither is controlling and that both are distinguishable on their facts.[12] On the other hand, and while recognizing that all decisions on this subject must be read in the light of the particular facts involved, we believe that *In re San Francisco Industrial Park, Inc.*, 307 F Supp 271 (ND Cal 1969), is much more closely in point on its application of California law to facts more similar to those involved in this case. No Oregon cases in point have been cited by either party and we find none.

---

[10] See, e.g., Shelley v. Byers, 73 Cal App 44, 238 P 177 (1925); Golden State Lanes v. Fox, 232 Cal App 2d 135, 42 Cal Rptr 568 (1965); In re San Francisco Industrial Park, Inc., 307 F Supp 271 (ND Cal 1969); Workmon Constr. Co. v. Weirick, 223 Cal App 2d 487, 36 Cal Rptr 17, 20 (1963); Umpqua Forest Ind. v. Neenah-Ore. Land Co., 188 Or 605, 614, 217 P2d 219 (1950); Cowles v. Zlaket, 167 Cal App 2d 20, 334 P2d 55 (1959); and Lee v. Marchetti, 4 Cal App 3d 97, 84 Cal Rptr 55 (1970). Cf. Blue River Sawmills et al v. Gates et al, *supra* note 7 at 460; Kohler v. Gilbert et ux, 216 Or 483, 503, 339 P2d 1102 (1959); and Stephens v. Allen et al, 11 Or 188, 3 P 168 (1883).

[11] Rochester Capital Hearing Corp. v. K & L Litho. Corp., 13 Cal App 3d 697, 91 Cal Rptr 827 (1970), and Beeler v. American Trust Co., 24 C2d 1, 147 P2d 583 (1944).

[12] *Rochester* involved personal property and was subject to provisions of the Uniform Commercial Code. The bargaining positions of the parties were unequal in that the seller-lessee was starting a small printing company, while the other party was a large mortgage company. The court found the transaction to be usurious. There was also an express option to repurchase.

*Beeler* turned largely upon the fact that the market value of the property was more than twice the "sale price," with an even greater disparity between fair market rental and agreed "rental," among other things. Even so, Traynor, J., dissented.

The trial judge expressed the view at the conclusion of the trial of defendant's equitable defenses that this was not a loan transaction, as contended by defendant, but that defendant sold this warehouse to plaintiff and then leased it back. After reviewing the testimony and the exhibits, as well as the legal authorities, we agree and hold that defendant did not prove its affirmative allegations to the contrary by the clear and convincing evidence required in such cases.

3. *The parol evidence offered by plaintiff was insufficient to establish that this transaction was intended to be a "hidden security transaction."*

Ten of defendant's assignments of error involve the exclusion of parol evidence claimed by plaintiff to be "relevant to show the intention of the parties and the true nature of the transaction."[19]

---

[19] These assignments of error are to the effect that the trial court erred in excluding the following evidence:

No. 4. That between 1966 and 1968 Overmyer had "embarked upon a warehousing construction program."

No. 5. The reasons "why" the various documents were "executed by a member of your [Overmyer's] corporation."

No. 6. Whether Mr. Overmyer had "any reason why you would be entering into such a transaction."

No. 7. "What was the financial situation of the Overmyer Company in 1967?"

No. 8. What Mr. Overmyer "did immediately prior to the execution of these documents."

No. 9. Whether Mr. Overmyer was "in charge of Mr. Fitzsimmons [one of his representatives]" or "instruct(ed) him what to do" during "negotiations prior to entering into this lease."

No. 10. Why Mr. Overmyer approved the contract provision for approval by the Director of Internal Revenue.

No. 11. Whether, when Mr. Overmyer approved the transaction, the "purpose [was] to be a financing arrangement."

Nos. 12 and 13. What Mr. Overmyer subsequently said to plaintiff when plaintiff later told him "some of the things he was interested in and why this was a satisfactory arrangement to

Defendant contends that it was entitled to show the "facts and circumstances" at the time of the transaction. Defendant also contends that when a deed, absolute in form, is given at the same time that a "separate defeasance agreement" is executed, parol evidence is admissible to connect the two agreements and to show that "the whole amounted to and was intended to be a mortgage" and that the same rule should apply in this case even though there was no repurchase agreement.

■ As previously stated, and as conceded by defendant, "the primary inquiry in a matter of this kind relates to the discovery, when possible, of the *mutual intention* of the parties at the time the transaction was consummated." The evidence offered by defendant relating to its financial problems at the time of the transaction and its reasons for entering into the transaction was inadmissible, however, because there was no showing that such facts had been communicated to or were known by plaintiff at that time, with the result that such evidence would show only defendant's unilateral intention, rather than the mutual intention of both parties.[19]

As also previously stated, the evidence in this case was that plaintiff entered into this transaction on the express condition that it be approved by the Internal Revenue Service as a bona fide sale and lease for fed-

---

him," including the fact that it was "a satisfactory tax arrangement."

No. 14. What "defendant's financial condition [was] prior to the date of the transaction and that defendant was entering into an over-all scheme of selling property."

[19] See Blue River Sawmills et al v. Gates et al, *supra* note 7 at 458, and Kitzke v. Turnidge, 204 Or 563, 573, 307 P2d 522 (1957). See also 3 Corbin on Contracts 67, 70, § 538 (1960).

eral income tax purposes. Plaintiff had no conversation with Mr. Overmyer or his representatives prior to or at the time of the transaction that gave him any reason to have a contrary understanding. His subsequent conversations with Mr. Overmyer, while perhaps admissible as evidence on the question of the prior intent of the parties, were also wholly insufficient to establish that plaintiff had any different understanding or intent.

Regardless of whether the trial court erred in excluding such evidence, however, we have read and have considered all of the evidence offered by defendant, including the evidence offered "under the rule" after the trial court had sustained objections to the relevance of such testimony, and find that such evidence fails to satisfy the requirement that when a party undertakes to prove that a conveyance, absolute on its face, was not so intended by the parties, such a contention must be established by clear and convincing evidence. In the absence of such evidence the presumption must prevail that the conveyance is what it purports to be.

For these reasons, we hold that these assignments of error have no merit.

4. *There was no prohibited forfeiture.*

   A. *An FED proceeding, including the defense of forfeiture, is controlled by Oregon law.*

Defendant also contends that California law is controlling in deciding whether there was a prohibited forfeiture in this case and that defendant is entitled to the benefit of various California statutory provisions

relating to forfeiture and to forcible entry and detainer.[8]

Again, defendant relies upon what it contends to be the "choice of law" provision of the contract. That provision states that "[t]his *contract* shall be *construed* according to the laws of the State of California." No such provision was included in the lease, which included a provision to the effect that there were no agreements between the parties other than as stated in that lease.

But regardless of that fact, the "choice of law" provision of the contract was limited to the interpretation of the contract. That provision may be controlling in deciding the question whether the transaction was a sale and leaseback or a "hidden loan" transaction. We must decide in this case, however, whether having found the transaction to be a sale and a leaseback, the lessor is entitled to the benefit of the provisions of the Oregon forcible entry and detainer statute, ORS 105.005, subject to such equitable defenses, including the defense of forfeiture, as may be recognized under Oregon law.

Plaintiff in this case makes no contention that defendant is not entitled to plead such an equitable defense in this proceeding.[9] He contends, however, that the question whether, as the lessor, he is entitled to the remedy of the Oregon FED statute, including the question whether the enforcement of such a remedy in

---

[8] These provisions include Cal Code Civ Proc §§ 1161-1179a (West 1973, Supp 1974).

[9] See Leathers et ux v. Peterson, 195 Or 62, 66-68, 244 P2d 619 (1952), and Share v. Williams et ux, 204 Or 664, 683-84, 277 P2d 775, 285 P2d 523 (1955).

this case would result in an unlawful forfeiture, must be determined by application of Oregon law, rather than California law.

An FED proceeding is considered in both Oregon and California to be a local action, with the local purpose of preserving the public peace by providing an orderly means of obtaining possession of real property without a breach of the peace. *Crossen v. Campbell,* 102 Or 666, 676, 202 P 745 (1922). To the same effect, see *Mendoza v. Castiglioni,* 14 Cal App 2d 710, 58 P2d 939 (1936). Cf. *Lindsey v. Normet,* 405 US 56, 71, 92 S Ct 862, 31 L ed 2d 36 (1972), and *Lexton-Ancira, Inc. v. Kay & Soseman,* 269 Or 1, 522 P2d 875 (1974).

As also stated by the plaintiff, this is "an action brought in an Oregon court * * * against an Oregon corporation for the repossession of Oregon real property on which defendant is operating an Oregon business."

■ Under these circumstances, and considering the purpose of the FED statute, as previously stated, we hold that the interests of the State of Oregon and its relationship to this transaction and to the parties are such that plaintiff is entitled to the remedy provided by the Oregon FED statute, ORS 105.005-105.160. For the same reasons, we hold that the question whether, as a matter of defense, equitable relief should be granted in such a case is a question which is so interrelated to the availability of the remedy provided by ORS 105.005 so as also to be a question to be decided under Oregon law, rather than California law. Cf. *Lilienthal v. Kaufman,* 239 Or 1, 3, 395 P2d 209 (1951); *Casey v. Manson Constr. Co.,* 247 Or 274, 293, 428 P2d

898 (1967); *Erwin v. Thomas,* 264 Or 454, 459, 506 P2d 494 (1973). See also Restatement of the Conflict of Laws 2d (1971) §§ 6, 122, 189, 190. Indeed, it is interesting to note that in *Cambridge v. Webb,* 109 Cal Supp 2d 936, 938, 244 P2d 505 (1952), it is stated that California's unlawful detainer statutes, including the right of relief from forfeiture thereunder, are to be treated as constituting "a complete set of rules governing the rights of landlord and tenant in unlawful detainer actions." Cf. *Leathers et ux v. Peterson,* 195 Or 62, 66-68, 244 P2d 619 (1952).

To hold to the contrary would raise serious questions relating to the enforceability of leases of Oregon property whenever the one party resides in another state or the lease was executed in another state or the rents are payable in another state, among other possibilities, depending upon the law of such a state relating to forfeitures.

B. *Under Oregon law there was a forfeiture for failure to pay rent when due.*

Defendant contends, however, that it is entitled to relief even if Oregon law, rather than California law, is controlling. Thus, defendant contends: (1) that this lease was not self-executing, so as to result in an accomplished forfeiture without need of aid by the court for its enforcement; (2) that since the lease was not self-executing, plaintiff was required to give defendant proper notice of his election to enforce a forfeiture; and (3) that even if prelitigation forfeiture was accomplished, equity will under appropriate circumstances grant relief.

In considering these contentions it is important to bear in mind our previous decision in *Rainey v.*

*Quigley,* 180 Or 554, 557, 178 P2d 148 (1947), in which we said that:

> "Courts of equity have long recognized a distinction between forfeitures agreed upon by the parties and those provided by statute. Equity may relieve from the former, but not from the latter. * * *"

To the same effect, see *Baker v. Lehrer et al,* 210 Or 635, 641, 312 P2d 581, and *State Hwy. Comm. v. Demarest,* 263 Or 590, 599, 503 P2d 682 (1972).

In considering these contentions it is also important to bear in mind that this is an FED proceeding by a landlord against a tenant based upon the failure to pay rent due under the terms of a written lease, rather than a suit in equity involving a contract of some other nature. The rights of the landlord and tenant in such an action are specifically provided by statute. Thus, ORS 91.090 provides as follows:

> *"The failure of a tenant to pay the rent* reserved by the terms of his lease *for the period of 10 days,* unless a different period is stipulated in the lease, *after it becomes due and payable, operates to terminate his tenancy.* No notice to quit or pay the rent is required to render the holding of such tenant thereafter wrongful; provided, however, if the landlord shall, after such default in payment of rent, accept payment thereof, such acceptance of payment shall operate to reinstate such lease for the full period fixed by its terms, subject to be defeated or terminated by subsequent defaults in payment of rent." (Emphasis added)

The lease in this case includes the following provision:

> *"Section 15.01. Any of the following occurrences or acts shall constitute an event of default* under this Lease: (a) *if Tenant* (regardless of the

pendency of any bankruptcy, reorganization, receivership, insolvency or other proceedings, in law, in equity, or before any administrative tribunal, which have or might have the effect of preventing Tenant from complying with the terms of this Lease) *shall fail to* (i) *make any payment of net rent within ten (10) days after Landlord shall have given notice to Tenant that such payment is due,* * * *.

"*Section 15.02. If an event of default shall have happened and be continuing, the Landlord shall have the right at his election,* then or at any time thereafter while such event of default shall continue, *to give Tenant written notice of Landlord's intention to terminate the term of this Lease* on a date specified in such notice, which date shall not be less than thirty (30) days after the date of giving such notice, and on the date specified in any such notice all right, title and interest of Tenant hereunder shall thereupon expire * * *." (Emphasis added)

As previously stated, plaintiff does not dispute the fact that in such a proceeding the tenant may, by his answer, allege equitable defenses and seek equitable relief, as provided by ORS 16.460 (2), to the same extent as if the defendant had filed an original suit in equity. Plaintiff contends, however, that under the facts of this case the provisions of ORS 91.090 are controlling upon the question of the effect of defendant's failure to pay rent.

In *State Hwy. Comm. v. Demarest, supra,* as in this case, there was a lease which provided that if the lessee was in default for failure to pay rent for 10 days after it became due (the same period as provided by ORS 91.090), then the lessor, at his election, might declare the lease to be terminated. As in this case, when the FED proceeding was filed, the lessee tendered the rental payment. We held that in the ab-

sence of an equitable defense such as that of fraud, mistake or estoppel, the lease was terminated as a result of the failure of the tenant to pay rent for the period of 10 days after it became due. To the same effect, see *Caine v. Powell,* 185 Or 322, 330-31, 202 P2d 931 (1949), stating that excusable negligence or accident may also provide such a defense, but that each case "must depend to a great extent upon its own circumstances."

■ We have examined the entire record in this case and find that there was no fraud, mistake or estoppel and that defendant's failure to pay rent was not due to excusable negligence or accident. In December 1972 plaintiff's attorney wrote to defendant to demand payment of the delinquent rent and taxes and stated that unless paid in 10 days plaintiff would exercise "any and all legal remedies available." The delinquency in rental payments continued. In January plaintiff wrote a personal letter demanding rental payments then due for November, December and January. The payment for January was still not paid. On February 20th plaintiff wrote again that the January and February rental payments had not been made. Defendant did not respond to that letter.

Even after the formal letter of March 5, 1973, by plaintiff's lawyers stating that defendant was in default for failure to pay the January and February rent and giving notice of plaintiff's intention to terminate the lease on April 9th and to retake possession, nothing was done until April 5, 1973, when a purported "telephone tender" was made of the January and February rent, but not of the March rent, which was then overdue.

As pointed out by the trial judge, defendant apparently had sufficient funds to attempt to negotiate a repurchase of the warehouse. Accordingly, it is difficult to believe that defendant would have had any substantial difficulty in raising the funds required to make rental payments when due had it desired to do so. Thus, under all of the circumstances of this case, we find that defendant's equitable defense is insufficient, despite defendant's contention that a forfeiture will otherwise result.

Oregon cases cited by defendant in support of its contention to the contrary either did not involve the rights of landlords and tenants under leases subject to ORS 91.090 and 105.005 or are otherwise distinguishable on their facts.[⑰]

5. *Defendant's remaining assignments have no merit.*

a. Defendant contends that the trial court erred in rejecting its defense of "inadequate notice of deficiency."

In support of this contention defendant says that plaintiff's letter of February 20, 1973, "provided defendant with no notice that plaintiff intended to terminate the lease," as required under the "doctrine" of *Moore et ux v. Richfield Oil Corp.*, 233 Or 39, 377 P2d 32 (1962), in which we said (at 44-45) that:

> "* * * A notice of default must convey the message that the notifier is initiating the steps

---

[⑰] Oregon cases cited by defendant include Roth Develop. v. John Gen'l Contr., 263 Or 561, 503 P2d 493 (1972); Western Rebuilders, Inc. v. Felmley, 237 Or 191, 386 P2d 813, 391 P2d 383 (1964); Leathers et ux v. Peterson, 195 Or 62, 244 P2d 619 (1952); Caine v. Powell, 185 Or 322, 202 P2d 931 (1949); Rainey v. Quigley, 180 Or 554, 178 P2d 148 (1947); Williams v. Barbee, 165 Or 260, 106 P2d 1033 (1940); Stennick v. J. K. Lumber Co., 85 Or 444, 161 P 97, 166 P 951 (1917).

necessary to finally assert his legal rights and that if the default is not cured he may take final action as provided in the contract. * * *."

That statement must be read in the light of the facts of that case. Cf. *State Hwy. Comm. v. Demarest, supra* at 601. *Moore* was an original suit in equity, rather than an FED proceeding. The lease provided for notice of default and 30 days' grace after such notice. As stated in *Demarest* (at 602), in distinguishing *Moore,* "such terms constituted the exception mentioned in the statute."[18] The notice given in *Moore* was held to be insufficient for the purposes of those provisions of that lease, under the facts of that case.

Under the terms of this lease the failure to pay rent for 10 days is a default "after Landlord shall have given notice to Tenant *that such payment is due.*" This is the same 10-day "grace period" as provided by ORS 91.090.

■ Whether or not plaintiff's letter of February 20, 1973, gave notice to defendant that plaintiff "intended to terminate the lease," it was sufficient as a notice to defendant that the rental payments for January and February were "due." Cf. *Title & Trust Co. v. Durkheimer Co.,* 155 Or 427, 448, 63 P2d 909, 64 P2d 834 (1937). See also 2 Merrill on Notice 173-86, §§ 756-61 (1952). Upon the giving of that notice and the failure of the defendant to make such payments within 10 days, it was then in default and plaintiff then had the right to declare the lease to be terminated upon 30

---

[18] ORS 91.090 provides that "The failure of a tenant to pay the rent reserved by the terms of his lease for the period of 10 days, *unless a different period is stipulated in the lease,* after it becomes due and payable, operates to terminate his tenancy. No notice to quit or pay the rent is required to render the holding of such tenant thereafter wrongful; * * *." (Emphasis added)

days' notice. Cf. *State Hwy. Comm. v. Demarest, supra* at 596.

Plaintiff's further letter dated March 5, 1973, clearly gave notice of plaintiff's intent to terminate the lease in 30 days because of defendant's default in failing to pay the rental payments due for January and February, which were still unpaid at that time.

b. Defendant also contends that the trial court erred "in holding that any tender made after the instigation of the FED action was not a defense."

■ Again, upon defendant's failure to pay rent for a period of 10 days after such payments were due and after plaintiff's letter of February 20th, defendant was in default. Plaintiff was then entitled to terminate the lease and was not then required to accept a tender of the defaulted rental payment, at least in the absence of facts sufficient to constitute a valid equitable defense. Having properly held that no valid equitable defense was established in this case, the trial court correctly held that tender of rental payments after the filing of this action did not provide such a defense.

Tender of payment may have been "relevant to defendant's equitable defenses," as contended by it, depending upon the circumstances of the alleged tender. In this case, however, not even an attempted tender was made until more than 30 days after plaintiff's letter of March 5th. The alleged "telephone tender" on April 5, 1973, was also not a legally sufficient tender, at least insofar as the March rental payment was concerned.[9] No deposit in escrow of the delinquent rental payments was made until after this action was filed.

[9] Bembridge v. Miller, 235 Or 396, 403, 385 P2d 172 (1963).

c. Finally, defendant contends that the trial court erred "in holding that the availability of defendant's equitable defenses depended upon the defendant first establishing that it had an interest which is an ownership interest and not just that of a tenant."

We do not so interpret the holding of the trial court, at least when considered as a whole. In any event, upon review of the record in this case and for reasons previously stated, we hold that under the facts and circumstances of this case, including the circumstances of the alleged tender, defendant did not establish a valid equitable defense.[20]

Finding no error, the judgment of the trial court is affirmed.

McAllister, J., concurs in the result.

---

[20] Defendant also contends that the trial court erred "in sustaining objection to receiving defendant's Exhibit 4a, the Contract of Sale, into evidence." That contract was received in evidence in the separate trial of defendant's equitable defenses. It was not received in evidence on the subsequent trial of this case as an FED proceeding because it was not strictly relevant to the issues in that proceeding, once the equitable defenses had been denied. We have considered that contract, however, in our review of the evidence offered in both trials and hold that any error in excluding it for the purpose of the FED proceeding was not prejudicial to the defendant.