Argued and submitted April 22, reversed and remanded August 10, 1981

# BONNEVILLE AUTOMOBILE INSURANCE COMPANY,
*Petitioner,*

*v.*

# INSURANCE DIVISION,
*Respondent.*

## (No. 80-4-7, CA 19562)

632 P2d 796

Randall B. Kester, Portland, argued the cause for petitioner. With him on the briefs was Cosgrave, Kester, Crowe, Gidley & Lagesen, Portland.

Al J. Laue, Assistant Attorney General, Salem, argued the case for respondent. With him on the brief were Dave Frohnmayer, Attorney General, John R. McCulloch, Jr., Solicitor General, and William F. Gary, Deputy Solicitor General, Salem.

Before Richardson, Presiding Judge, and Thornton and Van Hoomissen, Judges.

THORNTON, J.

## THORNTON, J.

Petitioner seeks review of an Insurance Division order suspending its license to write insurance policies in Oregon for at least one year or until it complies with ORS 746.515(1) (which requires an insurer, on cancellation of a policy, to return any gross unearned premiums to the premium finance company) and ordering payment of a civil penalty of $47,924.76, plus an additional civil penalty of $2,000 pursuant to ORS 731.988(1).[1]

Petitioner assigns error to the hearing officer's:

1) refusal to stay the administrative proceedings pending resolution of two consolidated lawsuits between petitioner and Berjac of Portland (Berjac), a premium finance company, around which the present controversy centers;

2) finding the following facts despite the absence of substantial evidence to support them: a) that Berjac had notified petitioner that it had financed premiums on all policies involved in the proceeding; b) that all the policies had been cancelled; c) that the total gross unearned premiums totalled $81,332.46; d) that there was a danger to the various insureds whose policies were cancelled that Berjac would attempt to collect from them any premiums which it had financed and which had not been returned by petitioner; e) that petitioner "profited" to the extent of $45,924.76 from its dealings with Berjac; and f) that the measure of unearned premiums due Berjac was based on "pro-rata" as opposed to "short rate" computation; and

3) holding that petitioner had violated ORS 746.515(1).

---

[1] ORS 731.988(1) provides:

"Any person who violates any provision of the Insurance Code, any lawful rule or final order of the commissioner or any final judgment or decree made by any court upon application of the commissioner, shall forfeit and pay to the General Fund of the State Treasury a civil penalty in an amount determined by the commissioner of not more than $2,000 for each offense, or $10,000 in the aggregate for all such offenses within any three-month period. In the case of individual agents or adjusters, the civil penalty shall be not more than $200 for each offense or $1,000 in the aggregate for all such offenses within any three-month period. Each violation shall be deemed a separate offense."

Petitioner is an insurer licensed, at the time of the incidents here involved, to do automobile liability insurance business in Oregon. One of its agents was Can Do Insurance, Inc. (Can Do). As Can Do placed a policy with petitioner, it would on occasion arrange premium financing with Berjac. Under this arrangement, the insured would pay a portion of the total premium as a down payment, and Berjac would finance the balance, in return for which the insured would sign a promissory note to Berjac for the amount financed and Can Do would guarantee payment to Berjac of this sum. The financing agreement form used also required assignment to Berjac of the policy and of any return premiums (in the event the policy was cancelled) as security and execution of a power of attorney to cancel the policy, for among other reasons, default in paying Berjac. In that agreement, Berjac also disclaimed any responsibility for seeing that payments made to Can Do would be properly passed along to petitioner.

Generally, when payment of the financed portion of a premium is received by an agent, it deducts its commission (in this case 15%) and transmits the balance to the insurer. The insurer holds this sum in trust and, as the period of coverage under the policy passes, the premium gradually becomes "earned." When a policy is cancelled by the finance company, ORS 746.515(1) provides:

> "Whenever a financed insurance policy is canceled, the insurer on notice of such financing shall return whatever gross unearned premiums are due under the insurance policy to the premium finance company for the account of the insured or insureds."

When the finance company receives the gross unearned premiums, it credits the account of the insured and refunds the balance to the insured. ORS 746.515(2). Unless the earned premium is less than the down payment or the insured is in default on the finance agreement, the unearned premiums will approximate the debt.

Between July, 1979, and March, 1980, Berjac financed approximately 600 of petitioner's policies sold by Can Do. As early as 1975, petitioner informed Berjac and others that it did not want its policies financed by premium finance companies because of difficulties it was having

with some of its agents, who were apparently slow in forwarding to petitioner its portion of the financed premiums. Further, petitioner informed Berjac in letters of January 7, 1975, December 31, 1977, April 7, 1980, and April 21, 1980, that if notwithstanding petitioner's wishes, its premiums were financed, then the finance company must pay the premiums to the insurer, not the agent. Additionally, petitioner informed Berjac that if the finance company paid petitioner rather than the agent, petitioner would not be responsible for returning to the finance company premiums that had not in the first place been paid to petitioner. Nevertheless, Berjac continued to deal with Can Do and petitioner continued to issue the policies. In February, 1980, Can Do went bankrupt. Thereafter, the hearings officer found, Berjac directed cancellation of a substantial number of policies, 193 of which are at issue, "for nonpayment of installments and other reasons."[2] Petitioner therefore became liable to remit to Berjac the gross unearned premiums supposedly held by it for the account of the various insureds. It refused to do so, however, contending that, because Berjac had violated petitioner's directive that financed premiums not be paid to the agent, it had forfeited its right to unearned premiums.

Petitioner tendered $35,407.70 into the hearing. There is considerable dispute as to what that sum represents as compared with the "gross unearned premiums" which the statute requires to be refunded, and a more comprehensive discussion is useful to fix the relationship.

---

[2] The precise basis for cancellation of the policies in this instance is uncertain. Neither party raises any question regarding the propriety of cancellation in this case. Berjac's managing partner testified that Berjac "requested" cancellation, which implies that petitioner terminated them through some power it had under the insurance policies, none of which are in evidence. The complaint filed by Berjac against petitioner alleges that this was the source of the power to terminate. The referee found that Berjac canceled the policies for nonpayment but there is no evidence of this in the record. The insolvency of Can Do, the precipatating factor in this controversy, would not of itself be a ground for Berjac's exercise of its power of attorney under the finance agreement. It would seem that the policy would remain in force and the insureds would continue to pay installments to Berjac. Can Do's insolvency would not render an insured in default unless the insured was paying Can Do, which failed to forward the sums to Berjac. Failure to spell out the basis for cancellation in this case is potentially relevant to our discussion below of the part of petitioner's second assignment of error relating to short rate versus pro-rata computation of gross unearned premiums.

A graphic depiction is set out in the margin as an aid to this discussion.[3]

The hearings officer found that the amount due as gross unearned premiums (AF on the graph) was $81,332.46. This sum was computed "pro rata," that is, it represents that portion of the total premiums which corresponds to the length of time the policies were in effect compared to the total policy time periods. Although it is not entirely clear from the record, it would follow from petitioner's arguments that petitioner computed the amount it felt was due on a "short-rate" basis. "Short rate" applies in some instances where a policy is cancelled for some reason attributable to the insured and permits the insurance company to withhold from the unearned premium an additional sum for certain overhead expenses. *Insurance Practice in Oregon,* § 7.9 (CLE 1969). On the graph the gross unearned premium computed at the "short rate" is represented by AE.

"Net unearned premiums" are calculated by deducting from gross unearned premiums the amount of the unearned agent's commission. (AD on the graph) Petitioner argues it is justified in refunding net premiums instead of gross premiums because Berjac paid Can Do and Can Do deducted its entire commission.

The sum actually tendered, according to petitioner (AC on the graph), is less than the amount of net unearned premiums due on *all* policies cancelled because petitioner

---

[3]

| A | B | C | D | E | F |
|---|---|---|---|---|---|
| I | I | I | I | I | I |

AF = Gross Unearned Premiums due on all policies - pro rata

AE = Gross Unearned Premiums due on all policies - short rate

AD = Net Unearned Premiums due on all policies

AC = Amount of Net Unearned Premiums attributable to policies cancelled after Can Do went out of business per petitioner

AB = Amount tendered per hearings officer representing net unearned premiums on policies cancelled after Can Do went out of business less amounts not forwarded by Can Do to petitioner attributable to those policies

"refunded" premiums due on policies cancelled before Can Do went out of business by crediting them to Can Do's account. Thus, those premiums were never actually returned to Berjac, and Berjac presumably must look to Can Do to recover them. The hearings officer stated, however, that the sum tendered "does not represent 'net unearned premiums' but amounts its insureds have paid in excess of earned premiums." We understand this to mean, based on our examination of the source of the hearings officer's findings, that this was the amount of net unearned premiums *actually forwarded* to petitioner by Can Do and attributable to policies cancelled after Can Do's closure (AB on the graph), not the sum which petitioner *should have received* (AC on the graph) had Can Do not been diverting funds received from Berjac to its own uses. It is impossible to tell from the record what the difference is between AC and AB. However, we need not make that determination to resolve the issues on this appeal because, regardless of which figure more accurately represents the amount tendered, the fact remains that it represents *net,* rather than gross, unearned premiums.

The hearings officer found petitioner in violation of ORS 746.515(1), suspended its license for one year and thereafter until it comes into compliance with the statute and ordered it to pay $47,924.76 (the difference between $81,332.46 and $35,407.70 actually tendered, plus a $2,000 penalty).

Petitioner moved to dismiss or alternatively to stay the proceeding pending conclusion of two consolidated lawsuits filed by petitioner and Berjac against one another which would purportedly determine the extent, if any, to which Berjac must bear the loss from Can Do's appropriation of funds destined for petitioner and subsequent bankruptcy because it (Berjac) violated the directive to make direct payments to petitioner. The motion was based on the *possibility that petitioner, should it not prevail before the* agency, would be collaterally estopped to relitigate certain issues in the civil proceedings. The hearings officer denied the stay and motion to dismiss. Petitioner assigns error only to the former.

■     The Insurance Commissioner is authorized to conduct any investigations he considers proper to enforce the code. ORS 731.236(3). To stay such proceedings is therefore a matter within the discretion of the hearings officer. *See Fry v. D.H. Overmyer Co., Inc.,* 269 Or 281, 290-91, 525 P2d 140 (1974).[4] Generally, the possibility of collateral estoppel is a proper basis for staying one proceeding pending determination in the other. *See Rorvik v. North Pac. Lumber Co.,* 99 Or 58, 190 P 331 195 P 163 (1921), overruled on other grounds in *Hansen v. Hayes,* 175 Or 358, 154 P2d 202 (1944); 1 Am Jur 2d *Actions,* § 94 (1962). In order for collateral estoppel to apply, there must be an identity of issues between the two proceedings. *Shannon v. Moffett,* 43 Or App 723, 726, 604 P2d 407 (1979), *rev den* 288 Or 701 (1980). Petitioner's complaint against Berjac embodied the theory that Berjac intentionally interfered with the business and prospective contractual advantage of petitioner and sought a declaration as to whether Berjac had the right to represent to the Insurance Division and the various insureds whose policies were cancelled that petitioner had unlawfully withheld the unearned premiums. If not, the complaint alleges, Berjac's conduct amounted to harassment. Berjac's complaint in the other action relied entirely on the policy and the finance agreement, not on the statute. It alleged that, under the insurance policy, the insurer is required upon cancellation to refund to the insured any unearned premiums and, under the finance agreement, the refunded amounts are assigned to Berjac as security for the debt and are payable directly to Berjac.[5]

Under the pleadings of those cases, insofar as the record shows, the only possible relevance an administrative determination that petitioner had violated ORS 746.515(1) might have is to show that Berjac's complaint to the Division, which petitioner claims amounts to harassment, was justified. Whether petitioner's conduct was a violation of statute is not the final measure of whether Berjac's activities constituted harassment or intentional interference with contract, and the issues are not coextensive. Nevertheless, an administrative determination of a statutory

---

[4] There are no statutes in point.

[5] Neither of the answers to these complaints is included in the record.

violation would undermine petitioner's ability to show harassment and it might well be precluded from relitigating the point.[6]

■ We conclude, however, that the stay of proceedings was properly denied. The Division has primary responsibility for enforcing the Insurance Code, a duty which prompted the present proceeding. Any type of violation which involves two or more entities is likely to result in associated litigation between them, which in turn is likely to encompass issues which are before the Division in an administrative proceeding. In some instances, the party seeking recovery may rely on the very statute upon which administrative disciplinary action is predicated. To hold that the Division had to delay its consideration of the disciplinary matter pending the outcome of related litigation would frustrate its enforcement efforts. The existence of a prior court determination that a statute was or was not violated could complicate the agency's task significantly. Logically, it makes more sense to stay the litigation pending interpretation of a statute by the agency with expertise in the area, which is charged by law with construing, expressing and enforcing legislative policy. We conclude that there was no abuse of discretion in denying the stay in this case.

Petitioner contends there is no evidence of substance to support the finding that it had notice of the financing of 193 policies in dispute here and that all those policies had been cancelled. The principal source of both findings is an exhibit prepared by Berjac for the Division's use which showed both the cancellation dates and the notifications penciled in from other records of Berjac. Berjac's managing partner testified that it was Berjac's standard procedure to give notice to petitioner shortly after the finance agreement was received and that the list of agreements was prepared under his supervision, although he had not personally prepared it. Petitioner objected to admission of this document on the ground that it was unreliable *(i.e.,)*

---

[6] Some of the hearings officer's findings, discussed *infra,* rest on evidence which might not be admissible in court. This fact reduces the likelihood that petitioner would be barred completely from relitigating those findings. *Shannon v. Moffett,* 43 Or App 723, 730-31, 604 P2d 407 (1979), *rev den* 288 Or 701 (1980).

the exhibit was compiled from records which were not offered in evidence at the hearing).[7]

■        ORS 183.450(1) reads:

"Irrelevant, immaterial or unduly repetitious evidence shall be excluded but erroneous rulings on evidence shall not preclude agency action on the record unless shown to have substantially prejudiced the rights of a party. All other evidence of a type commonly relied upon by reasonably prudent persons in conduct of their serious affairs shall be admissible. Agencies shall give effect to the rules of privilege recognized by law. Objections to evidentiary offers may be made and shall be noted in the record. Any part of the evidence may be received in written form."

The admissibility of documentary or other evidence at trial is generally a matter within the discretion of the trial judge and we review only for an abuse of discretion. *Vander Veer v. Toyota Motor Distributors,* 282 Or 135, 146-47, 577 P2d 1343 (1978). Administrative hearings officers have similar discretion and, assuming it is relevant, evidence may be received despite the fact that no showing is made to satisfy the Uniform Business Records as Evidence Act criteria (ORS 41.680-710) required for admission of the same document in court. The only other criterion is whether the evidence is of the type upon which prudent persons commonly rely. ORS 183.450(1). The hearings officer determined it was, and we find no basis for concluding otherwise. Petitioner made no attempt to subpoena the source records and introduced no evidence to suggest they were in error. Petitioner has shown no substantial prejudice, and we conclude the exhibit provides sufficient evidence to support the hearings officer's determination that petitioner had notice of finance and cancellation.

■        The determination of the amount of gross unearned premiums is another matter. There is no indication in the record as to how the hearings officer arrived at the figure $81,332.46 from the exhibits he cites as authority. The first, the one discussed previously, merely provides information as to which policies were at issue in this case,

---

[7] Petitioner does not assign error specifically to the admission of this document, but, since it is the gist of its objection to the findings of adequate notice and cancellation, we will examine the point.

when they were cancelled and when petitioner received notice of financing. There is no information as to the amount of premium paid or earned. The other two are petitioner's statements of account with Berjac and Can Do. The account with Berjac shows unearned premiums to be returned in the amount of $30,458.90. Prior to the final determination, a subsequent accounting raised that figure to $35,407.70, the amount petitioner tendered at the hearing. The Can Do account shows a final balance owing from Can Do of $63,546.81. It is not clear if this account was confined to those policies at issue and whether the figure represents the balance of *gross* premiums due petitioner on financed policies or whether it reflects *net premiums (i.e.,* allows for deduction of the 15% agent's commission). There is no indication of the *process* of comparison used by the hearings officer, and we therefore remand the case to the Division to spell out its reasoning. *McCann v. OLCC,* 27 Or App 487, 498, 556 P2d 973 (1976), *rev den* (1977).

■        Similarly, we remand for more explicit findings on whether the amount of gross unearned premiums should be computed pro rata (as we assume the hearings officer did, based on his declaration to that effect) or "short rate." First, the basis for using one or the other does not appear from the record nor in any statute or rule we have found. Such a computation is required by statute to be included in fire insurance policies (ORS 743.636) and is optional in health insurance policies (ORS 743.471), but no similar provision exists for automobile insurance. No policy of the type involved here is in evidence. Second, assuming the distinction applies, it appears that petitioner cancelled the policies at the "request" or on the "demand" of Berjac, which was acting apparently pursuant to its authority to cancel the policies for nonpayment. It is not clear why 193 insureds would, upon Can Do's insolvency, quit making payments on policies written by petitioner which remained in force despite the bankruptcy of Can Do and thereby subject the policies to cancellation under Berjac's power of attorney. If in fact this is the case, it would appear that the policies were cancelled "by the insured," and petitioner would thus be entitled to compute the amount of gross unearned premiums at the short rate. Finally, there is no evidence of what the "short rate" is in this case.

■ The remaining substantial evidence objections are not well-taken. Berjac wrote a letter to the insureds whose policies it financed stating that it would proceed against them individually for unpaid portions of financed premiums if it could not recover those sums from petitioner. This supports a finding of potential injury to insureds, despite petitioner's assurance that it would pay insureds any unearned premiums they had coming. Such a refund would not, for example, cover finance charges or interest which was accruing on the unpaid balance during the pendency of this dispute and which would not be accruing had petitioner paid gross unearned premiums to Berjac immediately. In any event, the degree to which insureds are threatened, while it may be relevant in fixing the penalty, is not relevant to the question whether a violation occurred for reasons discussed below under the third assignment of error.

■ Petitioner also argues that the hearings officer erred in computing the amount of "profit" for which petitioner may be liable under ORS 731.988(2), which provides:

"In addition to the civil penalty set forth in subsection (1) of this section, any person who violates any provision of the Insurance Code, any lawful rule or final order of the commissioner or any final judgment or decree made by any court upon application of the commissioner, may be required to forfeit and pay to the General Fund of the State Treasury a civil penalty in an amount to be determined by the commissioner but *not to exceed the amount by which such person profited in any transaction which violates any such provision,* rule, order, judgment or decree." (Emphasis added.)

This figure will also have to be redetermined on remand when gross unearned premiums are retabulated.

Petitioner argues that it did not "profit" because it had committed itself to refund unearned premiums to the insureds. In essence, this is an objection to the division's construction of "profit" to mean the difference between the gross unearned premiums due under ORS 746.515(1) and those actually paid by petitioner, in other words, sums wrongfully retained. In the context of violations of ORS 746.515(1), this interpretation appears entirely reasonable.

ORS 183.482(8)(a). Otherwise, an insurer, on the strength of a promise to refund, could circumvent its statutory duty.

■    Petitioner's final assignment of error is that the hearings officer erred in interpreting ORS 746.515(1) by finding a violation where Berjac had failed to pay petitioner directly and where a certain percentage of unearned premiums had been already credited to Can Do under the established practice of the parties. The language of ORS 746.515(1) is clear: an insurer, upon cancellation of a financed insurance policy, is required to return any gross unearned premiums then due to the premium finance company. The portion of legislative history quoted by the hearings officer[8] demonstrates that the basic purpose of this statute is to provide a source of collateral to finance companies to offset the balance owing on the financed portions of insurance premiums. Petitioner does not contest that it did not pay the entire gross unearned premiums to Berjac. It argues basically that it was justified in paying only that portion not credited to Can Do's account because Berjac ignored its directive and that it did not violate the spirit of the statute because it guaranteed payment to the insureds of any premiums subsequently determined to be

---

[8] The legislative history quoted by the hearings officer reads as follows:

"Senator: This is somewhat lower rate than a commercial loan company, a small loan company might charge, was that taken into account for balance?

"Faulstich: Yes and there's a reason for that actually, the . . . not the same risks are faced by a premium financier as by a commercial loan company primarily because you have obtained a consent on the part of the insured to cancel his policy and receive the unearned premium refund in the event that he fails to make a payment to the premium finance company so it *isn't quite the same risk you see because the premium finance company will get the reserve that the insurance company has been holding for unearned premium in the event of cancellation.*

"Senator: Will they get all of that reserve or only up to the amount of the . . .

"Faulstich: Only up to the amount they owe, or that is owed to them.

"Senator: And it's up to the premium finance company to remit the remainder to the insured.

"Faulstich: That's right. There would be few if any cases where that would be the case however. The premium finance company has usually figured these out so that the unearned premium will exactly take care of the outstanding debt." Senate Financial Affairs Committee, HB 1737, May 12, 1969, tape 5, side 1. (Emphasis added.)

unearned. The hearings officer determined that the language of the statute was mandatory, stating:

> "The assertion that the statute was enacted to benefit the insurance buying public but not the premium finance company misses the point. Ultimately the interests of both groups are intertwined and the statutory scheme must be seen as attempting to accomodate these interests."

We agree. Admittedly, the operation of this section can produce an apparently inequitable result where, as here, an insurer is obligated to refund to a finance company sums which the agent never passed on to the insurer and which cannot now be collected from the insolvent agent.[9] The legislative scheme is, however, clear in our view, and redress of systemic inequities must be sought in legislation. An insurer is not at liberty to circumvent the plain meaning of the statute by notifying a finance company that, unless certain conditions are met, it (the insurer) will not be liable, despite the statute, for return of gross unearned premiums.

The argument that there was no violation because petitioner's guarantee of payment of any gross unearned premiums to insureds assures that the latter will not be harmed is irrelevant. The statutory scheme also serves premium finance companies by guaranteeing a source of collateral to reduce the risks of financing. If a financier is required to litigate in order to recover unearned premiums, it creates a substantial additional risk, contrary to legislative intent. We therefore affirm the finding that a violation of ORS 746.515(1) occurred.

On review of contested cases under the APA, this court has no authority to substantively review administratively imposed sanctions. *Mary's Fine Food, Inc. v. OLCC,* 30 Or App 435, 440, 567 P2d 146, *rev den* 280 Or 683 (1977). It might be logical to assume that the suspension was a sanction for the statutory violation and the civil penalty dependent upon the amount found wrongfully retained. By

---

[9] We intend no implication that we view the present statutory scheme as inequitable. Either petitioner or Berjac must ultimately bear the loss from Can Do's misuse of financed premiums. Can Do was petitioner's licensed agent, although it may also have been Berjac's. Despite Berjac's failure to comply with petitioner's fiat that it be paid directly, petitioner continued to issue policies sold by Can Do, even after it became aware of Can Do's financial difficulties.

this logic, we could affirm the suspension and remand for redetermination of the amount wrongfully held by petitioner. Because the recomputation may produce a lesser figure and the size of the sum might bear on the possible sanctions, we remand that question to the Division as well.

Reversed and remanded.