Argued and submitted June 18, 1980, reversed and remanded January 5,
respondent's reconsideration denied February 19,
respondent's petition for review denied April 7 (290 Or 727),
appellant's reconsideration allowed, former opinion
modified; remanded for further proceedings
(52 Or App 685, 629 P2d 827) June 8, 1981

LONG,
*Respondent,*
*v.*
STORMS et al,
*Appellants.*

(No. A7902-00713, CA 15328)

622 P2d 731

Douglas D. Hagen, Portland, argued the cause for appellants. With him on the briefs were Kafoury & Hagen, Portland, and Greg Bennett, Portland.

Alan H. Tuhy, Portland, argued the cause and filed the brief for respondent.

Before Joseph, Presiding Judge, and Warden and Warren, Judges.

WARREN, J.

## WARREN, J.

Plaintiff brought this Forcible Entry and Detainer (FED) action in district court to recover possession of certain residential premises. Defendants answered and counterclaimed, alleging: (1) that the warranty deed to the premises, given to plaintiff by defendants, should be declared an equitable mortgage; and (2) that the loan transaction between the parties should be rescinded pursuant to the Truth in Lending Act (TILA), 15 USC § 1601 *et seq.* and that defendants should be awarded restitution and damages. Because defendants' answer and counterclaims raised an issue regarding the determination of title to real property, the case was transferred to circuit court as provided by ORS 46.084.[1] The circuit court found that defendants failed to sustain their burden of proving their defenses and counterclaims and held that plaintiff was entitled to possession of the premises and to damages for wrongful withholding. Defendants seek reversal of this judgment, a decree that the deed is a mortgage, and remand for determination of appropriate relief.

The facts surrounding the parties' negotiations are generally disputed. Defendant Marilyn Storms (hereinafter referred to as defendant or Storms) testified as follows: In 1975, prior to her marriage, Storms purchased the house which is the subject of this action for $33,400 and assumed an 80 percent loan to Far West Federal Savings and Loan Association, which was secured by a trust deed. Early in 1978, Storms and her husband suffered financial difficulties and began falling behind in their monthly house payments. They subsequently received a trustee's Notice of Sale, stating that the house would be sold on July 5, 1978, at 10 a.m., unless the delinquencies were cured. Defendant and her husband unsuccessfully attempted to secure a loan from banks, friends and relatives.

On June 29, 1978, according to defendant, plaintiff contacted defendant and informed her that he had read

---

[1] ORS 46.084 provides:

"While the title to real property may be controverted or questioned in an action in district court, the judgment in said action shall in no way affect or determine title between the parties or otherwise."

about the impending foreclosure on her house. Plaintiff offered to loan defendants money to avoid the foreclosure, but said that he expected to realize a profit of at least $1,000, with repayment in six months, and that he would need a deed to the house as security for the loan. Defendants accepted plaintiff's offer, deciding it was their only alternative to foreclosure.

On the morning of July 5, 1978, defendants met plaintiff at a title insurance company. Storms signed a preprinted warranty deed which she thought was a second mortgage. Apparently while at the title company the parties determined the consideration to be recited in the deed. In arriving at the figure of $31,400, plaintiff stated, "[I]t doesn't make any difference. These figures are all arbitrary and they are all key punched-in figures." Defendant stated that neither she nor her husband received this sum of money and that the house was then worth approximately $50,000.

Upon arriving at the office of the trustee, Storms said, plaintiff paid the necessary funds in time to avoid the sale. Later that day, plaintiff told defendants that additional papers would need to be signed, including a lease with an option to repurchase.

On July 18, plaintiff presented defendants with a lease with an option to repurchase for their signature. He explained that a monthly rental of $435 would be necessary to meet his costs and the payments to Far West Federal. The purchase price recited in the option was $33,000. Plaintiff told defendants that this amount was "just a punched-in figure" which would protect them in the event of his death and that the actual amount that they would have to repay would be determined at the end of the contract by taking into account the amount of money which he had loaned them, plus his costs and a profit of $1,000. Defendant testified that plaintiff failed to inform either her or her husband of their right to rescind the loan agreement or of any other disclosures required by TILA.

Michael Berry testified on behalf of defendants that he owns a lot and mobile home and that in 1978 he fell behind in his mortgage payments to Far West Federal

Savings and Loan Association. He received notice that on July 5, 1978, that Far West would sell the property at a trustee's sale. Shortly before July 5, plaintiff contacted Berry and informed him that he was aware of the impending foreclosure and that he might be able to prevent Berry from losing his equity in the residence. At that time, Berry believed that he had an alternative, so he only spoke briefly to plaintiff. Berry prevailed in getting the trustee's sale postponed; however, after Berry's alternative did not materialize, he sought plaintiff's help. Plaintiff explained to Berry that he would pay the amount of money needed to reinstate the loan, but that Berry must deed the lot and mobile home to plaintiff, whereupon plaintiff would give Berry a lease with an option to repurchase. Plaintiff told Berry that his fee would include the expenses incurred in reinstating the loan plus $1,000 profit. Berry testified:

" * * * I was questioning * * * the necessity in deeding over * * * the property, and he [plaintiff] explained to me that in order for it to be legal for him to complete the transaction, that he would in actuality be buying the house, and I would repurchase it at a — at a figure which would cover the thousand dollars plus the expenses he incurred, a thousand dollar fee on the loan of that amount of money would — would constitute usury and —

"Q  Did he use that word?

"A  I believe so, yes."

A warranty deed was executed on July 25, 1978, conveying the property from Berry to L and C Secured Investment, Inc., a corporation held by two shareholders — plaintiff and Lyle Cummings. Although the deed recited that the consideration paid was $58,000, Berry testified that he did not receive any money from plaintiff or from L and C Secured Investment, Inc. Plaintiff informed Berry that:

" * * * the figure was in actuality an ambiguous figure; that the actual resale of the house would be * * * those costs that are reinstating the loan and the fees, that it didn't necessitate any sale figure on the warranty deed."

The price stated in the option to purchase was $59,500. Plaintiff explained to Berry that this figure was an approximation as to the costs incurred, plus the thousand dollars profit, and was dependent on how long Berry would lease

the property. Plaintiff paid the amount necessary to reinstate the mortgage with Far West, but the mortgage stayed in Berry's name. Berry continued to occupy the premises, paying plaintiff $1,000 for the first and last months' rent. Approximately one month after Berry conveyed the property to plaintiff, Berry presented plaintiff with a check for $6,440.80, and plaintiff reconveyed the house to Berry. On cross-examination Berry testified that plaintiff told Berry that he was not making him a loan.[2]

Plaintiff, on the other hand, testified as follows: Plaintiff was the branch manager of a finance company from March, 1970, to February, 1978. In May, 1978, plaintiff began investing in real estate on his own behalf, also as president of L & C Secured Investment, Inc., and as a partner in another investment business. Between May, 1978, and June, 1979, plaintiff acquired, on his own behalf or on behalf of the corporation or partnership, nine residential properties in the Portland area. All nine were distressed properties, but only two of these transactions involved a sale with a lease and option to repurchase (Storms' property and Berry's property).

On July 3, 1978, plaintiff contacted Storms about the possibility of selling her house before the impending trustee's sale. She advised him that she and her husband expected to receive sufficient funds from a friend to avoid the sale, and, therefore, they would not be interested in selling their house. However, on July 4, Storms informed plaintiff that they were now interested in selling their house, because they had failed to secure the necessary funds. At this time, it was agreed that plaintiff would lease the house back to defendants at a fair rental value with an option to repurchase within six months at a price which would not be based on market value. Plaintiff explained that certain costs of preventing the foreclosure would comprise part of the repurchase price and that he expected to

---

[2] Admitted into evidence during direct examination of Berry were Berry's receipts of payment of $1,000 for rent and $6,440.80 for exercise of the option to repurchase, the warranty deed from Berry to L and C Secured Investment, Inc., dated July 25, 1978, the warranty deed from L and C Investment, Inc., to Berry dated August 21, 1978, and an itemization of expenses, prepared by plaintiff, in connection with the reinstatement of the deed in Berry's name.

realize a profit of $1,000 for his efforts in the event they exercised their option to repurchase.

On July 5, 1978, the parties met at a title company where a warranty deed conveying the property from defendants to plaintiff was executed before a title officer. The stated purchase price to plaintiff was $31,400. The parties then went to the trustee's office, where plaintiff presented his check for $4,158.83 for arrearages and costs.

Plaintiff assumed defendant's loan from Far West, paying an assumption fee of one percent. After purchasing the house, he obtained an independent appraisal, which placed the fair market value of the property at $53,000. In addition, he prepaid the taxes on the property for one year, obtained fire, property, and title insurance policies, and took out a $16,000 second mortgage. He testified that his intention was to buy the house and that, if a loan had been intended, he would have insisted that the applicants fill out a credit application to enable him to investigate their creditworthiness. Plaintiff admitted that he did not notify defendants of their right to rescind the agreement under TILA. He said that he was aware of TILA due to his experience in the finance business, but that he did not make TILA disclosures, because the transaction between plaintiff and defendants was not a loan.

The following facts are basically undisputed. The lease option, signed on July 18, 1978, provided that "time is of the essence" and that if the option were not exercised on or before January 4, 1979 (six months from the date of the scheduled trustee's sale), the option would be void. The lease further provided that the first month's rent would be due upon signing the agreement.

Defendants failed to make their first payment to plaintiff on schedule, and on August 4, 1978, plaintiff instituted FED proceedings in district court. Defendants answered, contending that "there exists a security arrangement between Plaintiff and Defendants wherein both parties have an equitable interest in the property." Defendants, however, did not move for transfer of the cause to circuit court. Defendants subsequently cured the default, and the parties entered into a stipulation under which the

pending FED action was dismissed with prejudice to both parties.

Defendants were current in their payments through December, 1978. Desirous of repaying the money owed, defendants contacted plaintiff in early January, 1979, and requested an accounting. Plaintiff informed defendants that, as long as the matter could be resolved without an attorney, they owed $6,113.31, an amount not based on the written terms of the lease-option agreement. Defendants, nevertheless, consulted an attorney. Thereupon, plaintiff informed defendants that, because attorneys were now involved, he would require strict compliance with the option agreement, which provided for a repurchase price of $8,516.33. Negotiations between the parties broke down, and on January 19, 1979, plaintiff filed the present FED action. On February 2, 1979, defendants exercised their right of rescission under TILA and mailed a notice of rescission to plaintiff. Plaintiff admitted that he ignored their notice of rescission.

At trial, plaintiff contended that the stipulated judgment in the first FED action was res judicata as to the issues raised by defendants and that defendants, accordingly, were precluded from offering evidence to show that the deed was in fact a mortgage. Although the trial court specifically sustained plaintiff's objection to this evidence, it permitted defendants to make an offer of proof "under the rule."

As pointed out by defendants, plaintiff failed to plead affirmatively in his reply the defense of res judicata.[3] The Supreme Court stated in *Furlong v. Tish,* 189 Or 86, 95-6, 218 P2d 476 (1950), "that a party relying on the doctrine of res judicata or estoppel by judgment must plead and prove the facts justifying the application of such doctrine with particularity." We conclude that plaintiff waived his opportunity to rely on the defense of res judicata. Additionally, while res judicata generally applies to a dismissal with prejudice, *Hartung v. Unander et al,* 224 Or 165, 355 P2d 738 (1960), it does not apply to matters over which the original court did not have jurisdiction. *Norton et ux v. Van Voorst et ux,* 191 Or 577, 583, 231 P2d 947 (1951); *see also, Salitan et al v. Dashney et al,* 219 Or 553, 558-59,

347 P2d 974 (1959). Defendants' contention in the first FED action that plaintiff had only a security interest in the property put the title to the property in issue. Because district courts lack power to determine title to real property, ORS 46.084, the trial court in the first FED action lacked jurisdiction over defendants' defenses, and the disposition in the district court had no res judicata effect.

Because defendants sought, in their first affirmative defense and counterclaim, a decree that the deed from defendant Marilyn Storms to plaintiff was an equitable mortgage, we review this issue *de novo. Umpqua Forest Ind. v. Neenah-Ore. Land Co.,* 188 Or 605, 217 P2d 219 (1950).

It is well settled that a deed, absolute on its face, may be shown to be a mortgage. As explained by the Supreme Court in *Umpqua Forest Ind. v. Neenah-Ore. Land Co., supra,* 188 Or at 614:

> "Our decisions establish that if the intent appears that property was conveyed and received as security for the fulfillment of an obligation, the form of the instrument becomes immaterial and the true nature of the transaction may be shown by parol evidence. Neither fraud, mistake nor accident need be proven. *The primary inquiry relates to the intention of the parties at the time the transaction was consum[m]ated. Harmon v. Grants Pass Banking & Trust Co.,* 60 Or 69, 118 P 188. Mutual intent is to be determined, not alone by the instruments executed, but also by the attendant circumstances and the conditions under which the instruments were delivered. The issue can be resolved only after considering the situation of the parties, the price fixed relative to the value of the property and the conduct of the parties, both before and after the transaction, insofar as such conduct prospectively or retrospectively throws light upon the intent of the parties at the time of the transaction." (Citations omitted, emphasis supplied.)

Circumstances the *Umpqua* court pointed to as indicia that a mortgage was intended include: the fact that negotiations originated from an application for a loan, the dire financial straits of the grantor, the grantor's continued

---

[3] While plaintiff moved during trial for leave to amend his pleadings to include this defense, the trial court denied his motion in view of defendants' claim of surprise.

possession of the property, the intimate business or social relationship of the parties, failure of the grantee to carefully investigate the title of the grantor, failure of the grantee to ascertain the value of the property, inadequacy of consideration, and the lack of bargaining between the parties as to the value of the property with the controlling consideration being the profit inuring to the grantee.

Further indication of intent to create a mortgage is present:

" * * * [w]hen a deed absolute in form, is accompanied by an option to repurchase, the instruments must be considered together. The option does not of itself convert the transaction into a mortgage, but it is a circumstance to be considered in favor of the existence of a mortgage." (Citations omitted.) 188 Or at 642.

We recognize that a deed, absolute on its face, is presumptively what it appears to be and that evidence must be clear and convincing to support a finding that the deed is in reality a mortgage. *Umpqua Forest Ind. v. Neenah-Ore. Land Co., supra* 188 Or at 645-46; *Fry v. O. H. Overmyer Co., Inc.,* 269 Or 281, 292, 525 P2d 140 (1974). Nevertheless, as pointed out by the *Umpqua* court,

" * * * while recognizing the rule requiring clear and convincing evidence, the authorities in this and other states have also approved the rule applying peculiarly in courts of equity.

" '[R]egardless of the view that may be entertained as to the presumptive character of a deed with a stipulation for a reconveyance, or as to the standard of proof necessary to establish the instrument or instruments as a mortgage, the authorities are in general agreement in support of the proposition that where the question presented is whether the transaction is a mortgage or a conditional sale, as distinguished from the question whether an unconditional sale is involved, *evidence of a doubtful import will be construed in favor of the theory that a mortgage was intended, so that in such case a deed with a provision for a reconveyance will be construed as a mortgage rather than as a conditional sale.' "* 188 Or at 646. (Emphasis supplied.)

Because the initial stipulated judgment of dismissal in the original district court action had no res judicata effect, we conclude that it was error for the trial court in

the present case to exclude defendants' evidence concerning the intent of the parties in executing the deed and option.[4]

In its order, the trial court concluded that defendants had failed to sustain their burden of proof on their defenses and counterclaims. However, it is unclear whether the trial court, in reaching that conclusion, adhered to its original ruling rejecting defendants' evidence on the ground that it was barred by the doctrine of res judicata or whether the court, without so stating, reversed its original ruling, considered the evidence, and found defendants' evidence less credible than plaintiff's. Because we cannot tell from the record whether the trial court made a finding on credibility, the usual reason for attaching weight to the trial court's findings does not exist here. *Omlie et ux v. Hunt,* 211 Or 472, 576-77, 316 P2d 528 (1957).

After considering the testimony that was submitted under "the rule" and the circumstances surrounding the transaction, we conclude that the conveyance with the lease and option to repurchase was an equitable mortgage, or stated differently, a loan with a security interest. The undisputed evidence shows that defendants were financially distressed at the time of the transaction, that the purported sale price was substantially less than the fair market value of the property, that defendants remained in possession of the property, that plaintiff did not obtain an appraisal on the property until after the purported conveyance, and that there was no bargaining between the parties as to the consideration recited in the "deed." Instead, the controlling consideration was that plaintiff should realize a $1,000 profit plus costs. Finally, the form of the transaction was a deed absolute in form accompanied by an option to repurchase. That plaintiff did not require defendants to fill out a credit application does not persuade us that the

---

[4] On a number of occasions the court sustained plaintiff's objections to the introduction of evidence to show that the deed was in fact a mortgage on the ground that the evidence was barred by res judicata. There is nothing in the record which shows that the court changed its ruling. In a suit or action tried to the court it is presumed that immaterial evidence received over objection is disregarded by the court in reaching its decision. *Haviland v. Johnson,* 70 Or 83, 85, 139 P 720 (1914). We believe the corollary to that rule requires us to presume that admissible evidence which is erroneously excluded is not considered in reaching a decision unless the trial court clearly evidences the intent to do so.

transaction was a sale, not a loan. Plaintiff knew that defendants were financially distressed and had been unable to obtain a loan. Further, he had defendants' house as security. The sum of these facts squares clearly with our conclusion that the transaction between the parties constituted a loan with a security interest.

The next issue presented is whether the Truth in Lending Act, 15 USC § 1601 *et seq* applies to the transaction between plaintiff and defendants.

Capsulizing this legislation, in *Eby v. Reb Realty, Inc.,* 495 F2d 646, 647-48, 650 (9th Cir 1974), the Ninth Circuit stated:

> "In general, the Truth in Lending Act requires a 'creditor' to disclose credit terms—for example, the annual interest rate—to a borrowing consumer. *See* 15 U.S.C. § 1638. Failure to make the requisite disclosures can subject the creditor to civil liability in an amount equal to double the finance charge paid in connection with the transaction, but in no event less than $100 or more than $1,000. 15 U.S.C. § 1640(a)(1) [current version at 15 USC § 1640(a)(2)(A)(i)]. Additional duties are imposed on a creditor—and different borrower rights come into play—when a security interest is retained or acquired, as part of a credit transaction, in any real property 'which is used or expected to be used as the residence' of the borrower. 15 U.S.C. § 1635(a). The debtor is given a right of rescission which must normally be exercised within three days of the consummation of the transaction. The lender must provide the borrower with written notice of this limited right to rescind in addition to making all the other usual disclosures required with any extension of credit. When the creditor fails to disclose any item of the requisite information, the right to rescind is not limited by the normal three day period but continues until all the disclosures are made. 15 U.S.C. § 1635(a).
>
> "* * * * *
>
> "The Truth in Lending Act is a remedial statute designed as much as possible to permit borrowers to make informed judgments about the use of credit. To effectuate this congressional purpose requires that the Act's terms be liberally construed."

The pivotal question that must be answered here is whether plaintiff is a creditor within the meaning of the Act. "Creditor," as defined in 15 USCA § 1602(f),

" * * * refers only to creditors *who regularly extend, or arrange for the extension of, credit* for which the payment of a finance charge is required, whether in connection with loans, sales of property or services, or otherwise. * * * " (Emphasis supplied.) (This section was amended March 31, 1980, by the Truth in Lending Simplification and Reform Act, P.L. 96-221, Title VI, § 602, 94 Stat. 168. Such amendment will not take effect until the expiration of two years after the date of enactment of this title [enacted March 31, 1980].)

Regulation Z, the Federal Reserve Board's interpretive regulation on TILA, defines "creditor" as one "who in the ordinary course of business" regularly extends credit. 12 CFR § 226.2(s)(1980). Further enlightenment on the meaning of "creditor" is found in the Ninth Circuit's discussion of legislative history in *Eby v. Reb Realty, Inc., supra,* 495 F2d at 649:

"The legislative history, though sparse on this point, is of some help. In both the House and Senate reports, the only comment relevant to the definition of creditor indicates that the term is to have a broad scope. Thus a small retailer who extended credit . . . in an isolated instance to accommodate a particular customer would not be covered [by the Act].' H.R.Rep.No.1040, 90th Cong., 2d Sess. 20 (1968); S.Rep.No.392, 90th Cong., 1st Sess. 13 (1967). 1968 U.S.Code Cong. & Admin.News, p.1962. Reading this along with the definitions in the statute and Regulation Z, *the intent seems to have been to except from the Act only those lenders whose extensions of credit are an occasional, isolated, and incidental portion of their business."*(Emphasis supplied.) (Real estate broker who extended credit in three out of seven sales over a 19-month period was held a creditor subject to the act.)

A case that is factually similar to the present case is *James v. Ragin,* 432 F Supp 887 (W.D. N.C. 1977). In *James* the court concluded that the transaction between the parties was, in substance, a loan with a security interest, and not a sale with an option to repurchase, under both federal law (TILA cases) and state law. Comparing the case to *Eby v. Reb Realty, Inc., supra,* the court stated that the definition of creditor should be applied so as to exclude only those who make isolated and incidental extensions of credit. Because defendant's activities were a regular, albeit intermittent, part of his business, the court found that he was a creditor subject to TILA.

After reviewing the evidence in the case before us, we find that plaintiff is a "creditor" within the meaning of the Truth in Lending Act. Within one month, plaintiff extended credit under very similar circumstances to two different parties.[5] Thus, as in *Eby* and *James,* we cannot say that plaintiff's extensions of credit were the kind of isolated or incidental transactions that the Act's definition of "creditor" was intended to exempt.

Accordingly, we find that defendants are entitled to rescind pursuant to 15 USC § 1635,[6] to the statutory

[5] Although the deed executed by Berry conveyed the property to L and C Secured Investment, Inc., and not to plaintiff, plaintiff, who negotiated the transaction, was the president of the corporation and held the stock with only one other person. Thus, in substance, plaintiff was the creditor in the Berry transaction.

[6] 15 USC § 1635 (1974) provides in pertinent part:

"(a) Except as otherwise provided in this section, in the case of any consumer credit transaction in which a security interest, including any such interest arising by operation of law, is or will be retained or acquired in any real property which is used or is expected to be used as the residence of the person to whom credit is extended, the obligor shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or the delivery of the disclosures required under this section and all other material disclosures required under this part, whichever is later, by notifying the creditor, in accordance with regulations of the Board, of his intention to do so. The creditor shall clearly and conspicuously disclose, in accordance with regulations of the Board, to any obligor in a transaction subject to this section the rights of the obligor under this section. The creditor shall also provide, in accordance with regulations of the Board, an adequate opportunity to the obligor to exercise his right to rescind any transaction subject to this section.

"(b) When an obligor exercises his right to rescind under subsection (a) of this section, he is not liable for any finance or other charge, and any security interest given by the obligor, including any such interest arising by operation of law, becomes void upon such a rescission. Within ten days after receipt of a notice of rescission, the creditor shall return to the obligor any money or property given as earnest money, downpayment, or otherwise, and shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction. If the creditor has delivered any property to the obligor, the obligor may retain possession of it. Upon the performance of the creditor's obligations under this section, the obligor shall tender the property to the creditor, except that if return of the property in kind would be impracticable or inequitable, the obligor shall tender its reasonable value. Tender shall be made at the location of the property or at the residence of the obligor, at the option of the obligor. If the creditor does not take possession of the property within ten days after tender by the obligor, ownership of the property vests in the obligor without obligation on his part to pay for it."

This section was amended March 31, 1980, by the Truth in Lending Simplification and Reform Act, P.L. 96-221, Title VI, § 612(a)(1), (3), (4), 94 Stat 175. Such amendment will not take effect until the expiration of two years after the date of enactment of this title [i.e., March 31, 1980].

penalty provided in 15 USC § 1640, and to reasonable attorney fees under 15 USC § 1640.[7] *Eby v. Reb Realty, Inc., supra; James v. Ragin, supra.* We require defendants, however, tender to plaintiff the principal of the loan that defendants received.[8] *Palmer v. Wilson,* 502 F2d 860 (9th Cir 1974). Because we have neither an accurate nor up-to-date accounting of the monies involved in the parties' transaction, we remand this case to the circuit court for a

---

[7] 15 USC § 1640 (1976) provides in pertinent part:

"(a) Except as otherwise provided in this section, any creditor who fails to comply with any requirement imposed under this part or part D or E of this subchapter with respect to any person is liable to such person in an amount equal to the sum of—

"* * * * *

"(2)(A)(i) in the case of an individual action twice the amount of any finance charge in connection with the transaction * * * .

"* * * * *

"(3) in the case of any successful action to enforce the foregoing liability, the costs of the action, together with a reasonable attorney's fee as determined by the court."

At the time *Eby v. Reb Realty, Inc., supra,* was decided this provision appeared as 15 U.S.C. § 1640(a)(2).

This section was amended on March 31, 1980, by the Truth in Lending Simplification and Reform Act, P.L. 26-221, Title VI, § 615, 94 Stat 180. Such amendment will not take effect until two years after the date of enactment of the title [enacted March 31, 1980].

[8] While defendants apparently did not tender to plaintiff the monies borrowed following their notice of rescission, this is not a necessary step under the Act. As stated by the Ninth Circuit in *Palmer v. Wilson,* 502 F2d 860, 861-62 (1974):

" * * * Although tender of consideration received is an equitable prerequisite to rescission, the requirement was abolished by the Truth in Lending Act. Section 1635(a) provides that an obligor exercises his right of rescission solely by notifying the creditor within prescribed time limits of his intention to rescind. Section 1635(b) provides that upon exercise by the debtor of his right of rescission, 'any security interest given by the obligor becomes void . . . . ' Within ten days after receipt of notice of rescission, 'the creditor shall return to the obligor any money or property given as earnest money, downpayment, or otherwise, and shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction.' Only then, '[u]pon the performance of the creditor's obligations under [section 1635],' must the obligor tender the property to the creditor. Section 1635(b) expressly provides that prior to performance of the required actions by the creditor, '[i]f the creditor has delivered any property to the obligor, the obligor may retain possession of it.'"

But see *Tri-West Const. v. Hernandez,* 43 Or App 961, 968, 607 P2d 1375 (1979), rev den 288 Or 667 (1980).

determination of relief consistent with our decision.[9] On remand, the circuit court may require an evidentiary hearing on this matter and may allow defendants to submit a proposed plan for repayment.[10]

In view of our conclusion that the relationship between the parties was that of debtor-creditor, rather than landlord-tenant, plaintiff's forcible entry and detainer action is dismissed.

Reversed and remanded.

---

[9] After the trial, defendants were evicted from the premises and plaintiff gained possession of the property. In the event the property is reconveyed to defendants by plaintiff, it must be reconveyed free from all encumbrances save the first mortgage from Far West Federal.

[10] In their answer and counterclaims, defendants claim that the loan was usurious and hence violative of ORS 82.010. Due to our disposition of this case under the Truth in Lending Act, plaintiff will not receive any interest on the principal of the loan and because the plea of usury afforded by ORS 82.120 is a defense only to an action on the contract, *Crisman v. Corbin,* 169 Or 332, 128 P2d 959 (1942); *Burkitt v. Vail,* 106 Or 41, 210 P 861 (1922), we decline to declare the loan usurious and thereby further penalize plaintiff.