Dear Mr. Travis:
You have asked us to determine whether a company engaged in the business of buying from and leasing back movable property to a consumer for a period of fifteen days is subject to licensure and regulation by the Office of Financial Institutions.
A number of documents used by the business were reviewed including a Notice of Right to Cancel, Bill of Sale, Personal Property Lease Agreement, Options for the Sale Lease-Back Program with 1 Item, Options for the Sale Lease-Back Program with 2 Items, Options for the Sale Lease-Back Program with 2 Items (Totaling $300), Options for the Sale Lease Back Program with 3 Items, Property Information Sheet, and Buyer Acknowledgement.
The scheme seems to operate so that an individual brings movable property which they own, most commonly a television, stereo, VCR or computer, and sells it to the business at which time the business immediately leases that property back to the original owner for a period of fifteen days. The item may be re-leased for two additional fifteen day periods, returned to the company or repurchased by the original owner from the company at the original purchase price. During the term of the "lease", a rental payment is made
While the documents are drawn to say that this is intended to be a lease, a careful review of the substance of the documents makes them appear far more akin to a consumer credit transaction or small loan.
Furthermore, a review of the Louisiana Consumer Credit Law, LSA-R.S. 9:3510 et seq., the Louisiana Small Loan Act, LSA-R.S.9:3577.1 and the current law regulating small loans, the Louisiana Deferred Presentment and Small Loan Act, LSA-R.S. 9:3578, et seq. seems to indicate that technically this transaction would not be covered.
The documents readily provide an amount for repurchase of the item or items which have been "sold" as well as the rental amount and taxes owed. The true substance of the transaction does not appear to be a lease but rather a disguised loan.
If in fact, the transaction is a loan, a calculation of the APR reveals that on a transaction involving one item with a fair market value of $200.00, the rate is 669%.
A review of case law indicates that the doctrine of substance over form could appropriately be applied to this situation.
In Frank Lyon Co v. United States, 435 U.S. 561 (1978), a tax case, the salient facts were that "Frank Lyon Company took title to a building under construction by Worthen Bank Trust Company (Worthen) of Little Rock, Ark., and simultaneously leased the building back to Worthen for long-term use as its headquarters and principal banking facility." 435 U.S., at 561 The case came up to the U.S. Supreme Court on a writ of certiorari because of an indicated conflict with a case from the U.S. Court of Appeals for the Fourth Circuit. The Court reversed the Court of Appeals, stating, in part, that:
 ". . . It suffices to say that, as here, a sale-and-leaseback, in and of itself, does not necessarily operate to deny a taxpayer's claim for deductions."
Justice Blackmun, for the 7-2 majority, in reversing the Eighth Circuit, reasoned, in part, as follows:
 "This Court, almost 50 years ago, observed that `taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed the actual benefit for which the tax is paid.' (citation omitted). In a number of cases the Court has refused to permit the transfer of formal legal title to shift the incidence of taxation attributable to ownership of property where the transferor continues to retain significant control over the property transferred (citations omitted). In applying this doctrine of substance over form, the Court has looked to the objective economic realities of a transaction rather than to the particular form the parties employed. The Court has never regarded `the simple expedient of drawing up papers'. . . was controlling for tax purposes when the objective economic realities are to the contrary. . . . Nor is the parties' desire to achieve a particular tax result necessarily relevant. . . . ."
In Edwards v. Your Credit, Inc., 148 F.3d 427 (Ct.App. 5th Cir., 1998), the U.S. Court of Appeals for the Fifth Circuit, in a Louisiana case, reversed the U.S. District Court for the Middle District of Louisiana, which had granted summary judgment in favor of the lender and remanded the case "for appropriate proceedings." The Court, per Garza, C.J., observed, in pertinent part, as follows:
 "We agree with the district court that the policy's language unambiguously created a non-filing insurance policy. (citation omitted). We disagree, however, with the court's conclusion that Edwards' argument sounds in reformation. . . . Edwards, however, contends that Your Credit and Voyager [Property and Casualty Insurance Company] deliberately structured the form of the policy in stark contract to its substance to take advantage of consumers for their mutual benefit. Such an argument is akin to the substance-over-form doctrine in tax law which we look past labels the parties give to a structure to determine is as economic reality (citations omitted). The Supreme Court and many other courts, including this one, have applied the substance-over-form doctrine to consumer finance law. (citations omitted). Thus, the substance-over-form doctrine provides the proper framework for analyzing this case."
 148 F.3d, at 435. (Brackets, Parentheses and bracketedmaterial supplied.
In Brower v. District of Columbia, 549 A.2d 1107 (Ct.App. DC,1988), a criminal usury case," the principal issue . . . [was] whether . . . appellants Rita A. Walker and Ferris Browner, . . . wife and husband, . . . were actually engaged in the criminal enterprise of making loans in a disguised form at legally impermissible rates and without a license." 549 A.2d, at 1108. The trial court, in a Bench trial, convicted Walker and Browner of three counts each of violating the District of Columbia Loan Sharking Act because "the transaction . . ., although otherwise denominated by the defendants, were in reality loans of the prohibited character." 549 A.2d, at 1108. Schwelb, A.J., for the Court, stated the salient facts, in part, as follows:
 "The controversy in this case arose out of a number of transactions . . . between the appellants and several homeowners who were in financial difficulty and were facing imminent foreclosure on their homes. . . . The appellants claimed that, rather than making loan, they were purchasing homes, leasing them back, and providing the former homeowners with an option to repurchase.
 "The trial judge found that . . . various homeowners . . . contacted the defendants . . ., seeking loans to save their homes, which were threatened with foreclosure. Instead of receiving loans, however, they were presented with and signed papers ostensibly conveying their property to Ms. Walker with a lease back and an option to repurchase within a year.
 "Although the transactions were denominated sales, the homeowners testified that they never intended to sell their property."
 549 A.2d, at 1109-1110 (Ellipses and bolding supplied).
The Court addressed several procedural issues raised on appeal by defendants Walker and Browner and restated that "[t]he principal contested issue, both in the trial court and on appeal, was whether the purported sales were really sham transactions that masked loans." Schwelb, A.J., for the Court, reasoned, in part, as follows:
 ". . . [A]ppellants' principal contention is that they were not lending money and were therefore not subject to the proscriptions of the Loan Sharking Act. . . . . [T]he courts have consistently held that questions whether usury and loan sharking laws, civil or criminal, apply to a particular transaction depends on the substance of that transaction and not on its form. Accordingly, the Loan Sharking Act may not be avoided by attempting to disguise the character of the arrangement, or by denominating what is rally a loan as something else. . . ."
 549 A.2d, at 1113-1114. (Brackets, ellipses, and bolding supplied).
 ". . . [I]f the transactions were in fact sales, as appellants contend, they were surely most extraordinary ones. In each instance, what the appellants characterize as the `sales' price bore no relation whatever to the value of the equity. It is absurd to suggest that Mrs. Carroll would knowingly sell her home, in which she had an equity of more than $36,500.00 for $8,100.00. None of the `sellers' had placed his or her home on the market or expressed the slightest interest in selling it. Each `seller' remained in possession after the purported sale, and appellants were indeed depicting their service as one that would enable their clients to `save' their homes from foreclosure. . . . it was therefore altogether reasonable for the trial judge to find that the depiction of each of these transactions as a sale and lease back was a transparent sham, which masked an unlawful loan."
 549 A.2d, at 1114. (Ellipses and bolding supplied).
 ". . . Indeed, in addressing the very kinds of arrangements at issue here, the courts have held that a transaction which is a sale in form is to be treated as a loan when this more accurately reflects the substance of the arrangement. As . . . stated in . . . Long v. Sotrms, 50 Or. App. 39, 49, 622 P.2d 731, 738 (1981),
 `. . . the undisputed evidence shows that defendants were financially distressed at the time of the transaction, . . . the purported sale price was substantially less than the fair market value of the property, . . . defendants remained in possession of the property, . . . plaintiff did not obtain an appraisal on the property until after the purported conveyance, and . . . there was no bargaining between the parties as to the consideration recited in the deed. . . . Finally, the form of the transaction was a deed absolute in form accompanies by an option to repurchase. That plaintiff did not require defendants to fill out a credit application foes not persuade us that the transaction was a sale, not a loan. Plaintiff knew that defendants were financially distressed and had been unable to obtain a loan. Further he had defendants' house as security. The sum of these facts square clearly with our conclusion that the transaction between the parties constituted a loan with a security interest.'
549 A.2d, at 1115. (Ellipses and bolding supplied).
 "The foregoing authorities involve civil proceedings, which might arguably be thought inapplicable to the construction of a criminal statute. The decisions interpreting criminal enactments, which prohibit the kind of conduct at issue in this case, however likewise eschew form to reach the substance of the transaction. In McWhite v. State, 143 Tenn. 222, 226, 226 S.W. 542, 543 (1921), which involved a criminal prosecution under Tennessee's usury laws, the court, in holding that a purported assignment of future wages makes a secured usurious loan, stated that it is `well settled by our cases that in all transaction of this character the court will disregard the form of the matter, and will look to its real substance.' (citations omitted)."
549 A.2d, at 1115-1116. (bolding and parenthesis supplied).
 "The class of persons protected by laws proscribing usury and loan sharking consists, essentially be definition, of individuals who, as a result of their financial plight, have improvidently made agreements so unconscionable that their enforcement is unwarranted. As the New York Court of Appeals [that state's highest appellate court] explained in Schneider v. Phelps, . . ., 41 N.Y.2d[238] at 243, 391 N.Y.S. [568] at 571, 359 N.E.2d [1361] at 1365[,]
 `The purpose of usury law, from time immemorial, has been to protect desperately poop people from the consequences of their own desperation. Law making authorities in almost all civilizations have recognized that the crush of financial burdens causes people to agree to almost any conditions of the lender and to consent to even the most improvident loans. Lenders, with the money, have all the leverage; borrowers, in dire need of money, have none.'
 ". . . Congress and the [District of Columbia] City Council have prohibited the kinds of exploitive and unconscionable practices, designed to take financial advantage of human desperation, which are reflected in this records. The trial judge correctly identified these practices for what they were, and appellants' convictions must be and each is hereby Affirmed."
 549 A.2d, at 1116. (bracketed material and ellipses supplied).
Thus, based on the documents themselves as well as the caselaw cited, it is our opinion that the company would be subject to licensure by the Office of Financial Institutions.
Very Truly Yours,
 RICHARD P. IEYOUB Attorney General
 By: __________________________ DEBORAH H. BAER Assistant Attorney General
DHB/jmc cc: Ms. Doris B. Gunn